A94A0826, A94A0827. GENERAL MOTORS CORPORATION
v. MOSELEY et al.; and vice versa.

BLACKBURN, Judge.

On October 21, 1989, as Shannon Moseley drove his 1985 GMC pickup truck through an intersection, he was struck on the driver's side by another pickup truck driven by David Ruprecht. The side saddle gas fuel tank on Moseley's truck ruptured, and burst into flames shortly after the collision. Moseley was killed in the incident,

and the medical examiner who performed an autopsy concluded that he died from thermal burns and smoke inhalation following the collision.

Thomas and Elaine Moseley, as administrators of Moseley's estate and as parents and sole survivors, commenced this action against General Motors Corporation (GM). Following trial in the matter, the jury awarded the Moseleys $4,241,611.84 against GM and Ruprecht on their wrongful death claim, and $1.00 on a claim for pain and suffering. The jury also assessed against GM $101,000,000 in punitive damages.

Subsequently, the State of Georgia sought 75 percent of the punitive damages award pursuant to OCGA § 51-12-5.1 (e) (2), which apportions that percentage of such an award to the State of Georgia and the remaining 25 percent to the plaintiffs in a product liability action. The trial court disallowed that apportionment, finding the statute unconstitutional. On appeal, however, the Supreme Court upheld the constitutionality of OCGA § 51-12-5.1 (e) (2), and reversed. *State of Ga. v. Moseley*, 263 Ga. 680 (436 SE2d 632) (1993).

GM filed a motion for new trial based on newly discovered evidence, which the trial court denied, and this appeal followed. The Moseleys, dissatisfied with the $1.00 award for pain and suffering and the trial court's denial of their request for prejudgment interest, also filed a motion for new trial which the trial court denied. The Moseleys have filed a cross-appeal from that denial of their motion for new trial.

The parties originally filed their respective appeals with the Supreme Court, on the ground that the case involved constitutional questions regarding the matter of punitive damages. However, after noting that the issues in these cases involve only the application of settled constitutional principles, and do not require the construction of either the Georgia or the United States Constitution, or a determination of the constitutionality of a law, the Supreme Court transferred the appeal and cross-appeal to this Court.

The State of Georgia has participated as an appellee in the appeal. Numerous entities also have filed amicus curiae briefs, including the United States Business and Industrial Council, the Product Liability Advisory Council, Inc., The Georgia Press Association, Lawyer for Civil Justice, the Business Roundtable, the Chamber of Commerce of the United States, and the National Association of Manufacturers. The record in the appeal and cross-appeal is immense, consisting of over 10,000 pages of record and exhibits and over 4,000 pages of trial transcript.

## Case No. A94A0826

1. GM filed a motion in limine to exclude evidence of other cases involving GM pickup trucks and fuel-fed fires. During a pretrial hearing on that motion, the trial court instructed: "There's going to have to be a showing [of substantial similarity] made before any mention of another case is made to this jury. That case is going to have to be run past the court and a determination made of the substantial similarity." GM contends that the jury's verdict in this case was poisoned by the plaintiffs' counsel's frequent and inflammatory reference to other lawsuits over post-collision fuel-fed fires without first making a showing of substantial similarity to the incident in question, in contravention of that pretrial ruling.

In product liability actions, evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect and punitive damages, provided there is a showing of substantial similarity. *Mack Trucks v. Conkle*, 263 Ga. 539 (436 SE2d 635) (1993). "Without a showing of substantial similarity, the evidence is irrelevant as a matter of law. . . ." *Carlton Co. v. Poss*, 124 Ga. App. 154, 155 (183 SE2d 231) (1971). See also *Hayes v. Gary Burnett Trucking*, 203 Ga. App. 693 (1) (417 SE2d 676) (1992).

In the instant case, counsel for the plaintiffs actually presented no evidence of similar incidents, but repeatedly referred to 120 other lawsuits (and occasionally an estimated 240 deaths) during opening statement, examination and cross-examination of witnesses, and closing argument. The record reveals that on at least 16 occasions, plaintiffs' counsel made such references, without ever attempting to make the required showing of similarity. On some of those occasions, GM raised no objection; several times, GM objected, but the trial court instructed plaintiffs' counsel to continue; and on four occasions, including motions for mistrial asserted during opening statement and following closing argument, the trial court overruled GM's objections. On one occasion, the trial court actually sustained GM's objection and disallowed the witness's answer.

The Moseleys contend that under these circumstances, GM failed to preserve this issue for review. However, where the trial court's ruling on a motion in limine is violated, further objection at trial is unnecessary to preserve the matter for appellate review. *Scott v. Chapman*, 203 Ga. App. 58, 59 (416 SE2d 111) (1992). "The purpose in filing a motion in limine to suppress evidence or to instruct opposing counsel not to offer it is to prevent the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury with respect to matters which have no proper bearing on the issues in the case or on the rights of the parties to the suit. It is the prejudicial effect of the questions asked or statements made in connection with

the offer of the evidence, not the prejudicial effect of the evidence itself, which the motion in limine is intended to reach." (Citations and punctuation omitted.) *Reno v. Reno*, 249 Ga. 855, 856 (295 SE2d 94) (1982).

In the instant case, the trial court emphasized that there was to be no "unbridled offloading" of other cases and that there would have to be a showing of substantial similarity, outside the presence of the jury, before any other case was mentioned. Plaintiffs' counsel's repeated breach of that ruling can only be regarded as deliberate, and considering the inflammatory nature of the references to a multitude of other lawsuits and deaths, we are unable to say as a matter of law that the frequent violation of the trial court's ruling did not influence the jury's verdict. *Scott v. Chapman*, supra; *Seay v. Urban Med. Hosp.*, 172 Ga. App. 344 (323 SE2d 190) (1984).

The plaintiffs suggest that GM's concern over this issue during the trial and on appeal is a "red herring." Relying upon *Skil Corp. v. Lugsdin*, 168 Ga. App. 754 (309 SE2d 921) (1983), they argue that a showing of substantial similarity is a foundational requirement only when evidence of other incidents is offered for the purpose of proving the existence of a defect, as opposed to showing *notice* of a defect.

The plaintiffs' argument begs the question, notice of what defect? If the relative defects are not similar, how can one be notice of the other? Regardless of whether the proper standard is "substantial similarity" or mere "similarity," the plaintiffs failed to make *either* showing. The plaintiffs' reliance upon *Skil Corp.* is misplaced, as that case addressed the relevance and permissible use of evidence of prior incidents, and not the foundational requirements for admission of that type of evidence. The similarity of the various incidents was conceded by *Skil Corp.* as is implicit in the opinion and nothing therein eliminates the requirements of a showing of similarity where such is in dispute. As stated above, the Supreme Court's holding in *Mack Trucks v. Conkle*, supra, makes it clear that before such evidence is admissible for whatever appropriate use, there must be a showing of substantial similarity to the incident at issue. The plaintiffs' failure to do so and the repeated breach of the trial court's ruling on the motion in limine in this case constitute reversible error.

GM also moved in limine to exclude evidence of discovery disputes in this or other lawsuits, and during the hearing on the motion, counsel for the plaintiffs assured the trial court that they would not introduce any such evidence. Notwithstanding that representation, several times during the trial, the plaintiffs' counsel inquired or remarked about GM's attempt to hide information regarding problems with the full-size pickup truck. Upon direct examination of a former GM engineer who left GM's employment in 1989, counsel elicited testimony about GM's practice of giving elusive answers to interroga-

ries, "woodshedding" engineers who testified, and incomplete searches of engineering files in response to discovery requests. Inasmuch as evidence of or reference to any other lawsuits was improper, it follows that this evidence of discovery disputes likewise should have been excluded.

2. Ronald Elwell, who was employed by GM as a safety engineer for 28 years, testified on behalf of the plaintiffs, regarding the development of the side saddle fuel tank on GM pickup trucks. (Elwell left GM in 1989 following an employment dispute, and subsequently sued GM over that dispute.)

GM had filed a motion in limine seeking exclusion of Elwell's testimony on the grounds that any knowledge he had regarding the fuel tank design would be privileged, but the trial court denied the motion to the extent that GM sought total exclusion of Elwell's testimony. However, the court noted that GM's argument regarding the attorney-client privilege was well-made, and that GM could object on a question-by-question basis during the trial. GM contends that the trial court erred in not excluding Elwell's testimony in its entirety as privileged.

The issue of disqualification of a witness usually arises in the context of one party calling as a witness an expert who was formerly retained by the adverse counsel or party. See Annot., 96 ALR2d 125 (1964). In some circumstances, the expert may be disqualified because of an extension of the attorney-client privilege. *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 308-309 (404 SE2d 607) (1991); *Wang Laboratories v. Toshiba Corp.*, 762 FSupp. 1246 (E.D. Va. 1991); *Marvin Lumber &c. Co. v. Norton Co.*, 113 FRD 588, 591 (D. Minn. 1986).

In some jurisdictions, the privilege also "has been interpreted as preventing disclosure of privileged information by former employees. [Cits.]" *Valassis v. Samelson*, 143 FRD 118, 124 (E.D. Mich. 1992). However, in Georgia, communications between principal and agent are not privileged, even if such communications ultimately reach the principal's attorney and are used in preparing a defense to litigation arising out of the occurrence forming the subject matter of the communications. *Atlantic Coast Line R. Co. v. Daugherty*, 111 Ga. App. 144, 150 (141 SE2d 112) (1965). The attorney-client privilege is confined to its narrowest permissible limits under OCGA §§ 24-9-21 and 24-9-24. *Ostroff v. Coyner*, 187 Ga. App. 109 (4) (369 SE2d 298) (1988).

In the instant case, Elwell was not called as an expert witness, but testified about his knowledge of the development of the side saddle fuel tank design acquired through his years of employment with GM. As a GM employee, he worked with a defense team in other cases involving that subject, but the defense team's utilization of Elwell's expertise did not bestow any privilege upon Elwell's experience

and observations. " 'It is axiomatic that one cannot render privileged that which is otherwise not privileged merely by placing it in the hands of his attorney.' [Cit.]" *Atlantic Coast Line R. Co. v. Daugherty*, supra at 150. Accordingly, the trial court correctly admitted Elwell's testimony.

3. During the litigation over his employment dispute, Elwell deposed Theodore Kashmerick, a retired GM engineer, for the purpose of asking Kashmerick about Elwell's claim against GM. During that deposition, Kashmerick testified that in 1980 or 1981, he discarded a lot of old documents, some dating back to 1953, stored in his filing cabinets. He did not know the specific contents of the discarded documents, but they concerned the design of the light to heavy GM trucks. He had undertaken this "housecleaning" at the request of the GM legal department, which thought that some of the documentation may be controversial and subject to misinterpretation. GM's counsel was present during the deposition but did not cross-examine Kashmerick.

Before the trial in the instant case, Kashmerick died, and the plaintiffs were allowed to play the video deposition of Kashmerick for the jury. GM contends that this deposition testimony was inadmissible, and we agree.

OCGA § 24-3-10 "requires as the prerequisite to the admission in a subsequent action of the prior testimony of a since deceased witness that the parties and issues in the two actions be substantially the same." *Transamerica Ins. Co. v. Thrift-Mart*, 159 Ga. App. 874, 876 (2) (285 SE2d 566) (1981). The purpose of that limitation is "to insure that the party against whom the testimony is now offered had an opportunity adequately to cross examine the witness at the previous proceeding." Id. at 877. That opportunity to cross-examine must have been such that the cross-examination, *or the decision not to cross-examine,* was meaningful. *Craft v. State*, 154 Ga. App. 682, 683 (269 SE2d 490) (1980).

In the instant case, the issue in Elwell's employment litigation was unrelated to any issue in the plaintiff's product liability action against GM. To the extent that Kashmerick's testimony about discarding old, unspecified documents on file could be said to have some relevance to the instant case, GM's employment counsel certainly had no reason to cross-examine Kashmerick regarding that "housecleaning" at the time of the deposition in that employment litigation. As such, with regard to the instant case, the opportunity to cross-examine Kashmerick during the deposition was not meaningful, and the deposition testimony should have been excluded.

4. Around 1983, GM began the process of totally re-designing its full-size pickup trucks, culminating in actual production of the new truck in 1988. The re-designed truck's fuel tank was situated inside

the frame of the truck. GM also moved in limine to exclude any reference to this re-design as inadmissible evidence of subsequent remedial measures, but the trial court denied the motion.

"[E]vidence of subsequent remedial measures is inadmissible to prove negligence. [Cit.]" *Orkin Exterminating Co. v. Dawn Food Products*, 186 Ga. App. 201 (366 SE2d 792) (1988). "The reason for excluding such evidence lies on sound public policy 'that men should be encouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed into an admission that they had been wrong-doers.' [Cit.]" *Doster v. Central of Ga. R. Co.*, 177 Ga. App. 393, 396 (339 SE2d 619) (1985). See also *Brooks v. Cellin Mfg. Co.*, 251 Ga. 395 (306 SE2d 657) (1983).

The plaintiffs argue that inasmuch as the plans for the re-design of the GM pickup truck began around 1983 and the product appeared on the market in 1988, the design change actually preceded the 1989 injury and death in this case, thus rendering inapplicable the rule regarding admissibility of subsequent remedial measures. However, that notion overlooks the fact that in this type of case, planning and implementation of design changes may take several years. In such situations, the same concerns are present as where the remedial measures actually follow an injury. As such, the fact that the design change preceded the injury in this case provides no basis for not applying the exclusionary rule.

The plaintiffs also contend that application of this rule is limited to negligence actions. (They asserted both negligence and strict liability as theories of recovery.) It appears that this issue has not been addressed in Georgia. See *Orkin Exterminating Co. v. Dawn Food Products*, supra. However, other jurisdictions are divided as to whether evidence of subsequent remedial measures should be admitted in strict liability actions. *Robinson v. G. G. C., Inc.*, 808 P2d 522 (Nev. 1991); *Pollard v. Ashby*, 793 SW2d 394 (Mo. App. 1990); *Dura Corp. v. Harned*, 703 P2d 396 (Alaska 1985); *American Broadcasting Cos. v. Kenai Air of Hawaii*, 686 P2d 1 (Hawaii 1984); *Caldwell v. Yamaha Motor Co.*, 648 P2d 519 (Wyo. 1982); *Kallio v. Ford Motor Co.*, 391 NW2d 860 (Minn. App. 1986); *D. L. By Friederich's v. Huebner*, 329 NW2d 890 (Wis. 1983); *Klug v. Keller Indus.*, 328 NW2d 847 (S.D. 1982); *Sanderson v. Steve Snyder Enterprises*, 491 A2d 389 (Conn. 1985); *Chapa v. Garcia*, 848 SW2d 667 (Tex. 1992) (admitting evidence of subsequent remedial measures); *Krause v. American Aerolights*, 762 P2d 1011 (Or. 1988); *Cox v. State*, 844 SW2d 173, 178 (Tenn. App. 1992); *Alderman v. Wysong & Miles Co.*, 486 S2d 673 (Fla. App. 1986); *Troja v. Black & Decker Mfg. Co.*, 488 A2d 516 (Md. App. 1985) (excluding evidence of subsequent remedial measures).

Jurisdictions allowing such evidence reason that inasmuch as the

doctrine of strict liability focuses on the character of the product placed in the stream of commerce, and not the conduct of the manufacturer, "it is manifestly unrealistic to suggest that . . . a [mass] producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule . . . does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability." *Ault v. Intl. Harvester Co.*, 528 P2d 1148, 1152 (Ca. 1974).

The jurisdictions that continue to exclude evidence of subsequent remedial measures in strict liability cases based on public policy find it "difficult to understand why this policy should apply any differently where the complaint is based on strict liability as well as negligence. From a defendant's point of view it is the fact that the evidence may be used against him which will inhibit subsequent repairs or improvement. It makes no difference to the defendant on what theory the evidence is admitted; his inclination to make subsequent improvements will be similarly repressed. The reasoning behind this asserted distinction we believe to be hypertechnical, for the suit is against the manufacturer, not against the product." *Werner v. Upjohn Co.*, 628 F2d 848, 857 (4th Cir. 1980).

In Georgia, although evidence of subsequent remedial measures is generally inadmissible in negligence actions, there are several exceptions to that rule, "such as when the subsequent repair, change, or modification tends to prove some fact of the case on trial (other than belated awareness of negligence, of course), to show contemporary knowledge of the defect, causation, a rebuttal of a contention that it was impossible for the accident to happen in the manner claimed, and so on." *Chastain v. Fuqua Indus.*, 156 Ga. App. 719, 722 (275 SE2d 679) (1980). Such evidence may also be admitted where the feasibility of repair or modification is an issue. *Wittenberg v. 450 Capitol Assoc.*, 207 Ga. App. 260, 262 (427 SE2d 547) (1993). However, when evidence of subsequent remedial measures is admitted for one of those exceptions, the jury should be instructed as to the limited purpose of its admission and admonished not to consider it as evidence of negligence. *Stuckey's Carriage Inn v. Phillips*, 122 Ga. App. 681, 687 (178 SE2d 543) (1970).

In view of the numerous exceptions to the general rule even in negligence actions, we find persuasive and hereby adopt the rationale discussed above for admitting evidence of subsequent remedial measures in strict liability cases. This holding is consistent with the growing trend in other states that have considered the issue. See *Krause v.*

*American Aerolights*, supra at 1015. However, where negligence and strict liability theories are asserted jointly in an action, at a minimum the jury must be instructed as to the proper use and limits of the evidence. See, e.g., *Sanderson v. Steve Snyder Enterprises*, supra at 396, n. 11. In such cases, it may be advisable to bifurcate or trifurcate the proceeding in order first to litigate the negligence claim, wherein the evidence of subsequent remedial measures may not be admissible, and then proceed to hear evidence on the strict liability theory (including evidence of any subsequent repairs or modifications) if the defendant prevails in the negligence phase of the trial.

5. At trial, Mike Juras, who was the chief design engineer for GM's pickup truck division from 1982 until 1989, testified that in his opinion, the pickup trucks with side saddle fuel tanks were safe trucks. He recalled the crash testing of the pickup truck, and noted that GM tested the truck for side impact collisions at 50 mph, which far exceeded the industry standard of 20 mph. On cross-examination, Juras explained that by industry standard, he referred to the Federal Motor Vehicle Safety Standard 301 (FMVSS 301). Counsel for the plaintiffs then inquired if he was aware that the National Highway Traffic Safety Administration (NHTSA) had initiated an investigation to verify that GM complied with that federal standard. The investigation had not been completed by the time of trial.

Before trial, GM moved in limine to exclude any reference to that NHTSA investigation, on the ground that it was hearsay. During the hearing on that motion, counsel for the plaintiffs generally agreed that the not yet completed, NHTSA investigation was hearsay, but argued that they could introduce it if GM claimed compliance with FMVSS 301. The trial court deferred ruling on the motion, but instructed that there was to be no mention before the jury of a NHTSA investigation until the court could rule on it.

We agree with GM that admission of this evidence of a pending NHTSA investigation was error. The mere fact that the NHTSA was investigating GM's compliance with the federal standard in question neither impeached nor confirmed GM's direct evidence that it had complied with that standard. "Evidence which does not in any reasonable degree tend to establish the probability of the issues of fact in controversy is irrelevant and inadmissible." (Citations and punctuation omitted.) *Tucker Fed. &c. Assn. v. Rawlins*, 209 Ga. App. 649, 652 (434 SE2d 94) (1993).

6. The trial court allowed counsel for the plaintiffs to question Robert Stempel, GM's former Chairman and CEO, as to various "standards" by which the jury should evaluate GM's actions in this matter. Those "standards" included a standard of caring about its customers as advertised by GM; a standard of honesty also promoted by GM; a standard promulgated by the Society of Automotive Engi-

neers (SAE) recommending that fuel tanks should be protected by the frame and body of a vehicle; GM's own internal testing standards for the vehicle in question; and the "industry standard," i.e., the design implemented by other manufacturers. GM contends that this line of questioning inappropriately asked for legal standards. We disagree.

The inquiry about caring and honesty addressed GM's observance of its own commercial promotions, and not legal standards of conduct. The inquiry about the SAE recommendation and the fuel tank design utilized by other manufacturers concerned the standard in the industry, which was relevant (although not conclusive) to whether GM exercised ordinary care, and did not ask for legal standards. *Ogletree v. Navistar Intl. Transp. Corp.*, 194 Ga. App. 41, 46 (390 SE2d 61) (1989). Likewise, the subject of GM's internal testing standards pertained to the issue of ordinary care, rather than a legal standard. Accordingly, the trial court did not err in allowing the inquiry.

7. GM contends that the trial court erred in denying its motion for new trial based upon newly discovered evidence. At trial, the driver of a vehicle that was struck by Shannon Moseley's truck, and a police officer who arrived on the scene shortly after the collision, testified that they saw Shannon moving about as if trying to get out of the burning truck, and heard him screaming. GM attempted to counter those eyewitness accounts with expert testimony that Shannon probably was either knocked unconscious or killed by the initial impact of the collision. In support of its motion for new trial, GM proffered the testimony of two individuals who claimed to have arrived at the scene before the police officer and observed that Shannon Moseley appeared to be unconscious. They had come forward after hearing of the verdict following the trial.

In order to obtain a new trial based on newly discovered evidence, the movant must show, among other things, that the evidence will not merely impeach the credit of a witness. *Timberlake v. State*, 246 Ga. 488, 491 (271 SE2d 792) (1980). In the instant case, the testimony of the two new eyewitnesses would serve merely to discredit the testimony of the two eyewitnesses who appeared on behalf of the plaintiffs. For that reason, the trial court correctly determined that the newly discovered evidence submitted by GM did not warrant a new trial. *Leventhal v. Seiter*, 208 Ga. App. 158, 162 (430 SE2d 378) (1993).

8. GM attacks the award of punitive damages on several grounds. Although the award for punitive damages necessarily falls with the reversal of the judgment in this case, we address GM's contentions regarding issues that may recur upon retrial.

(a) GM asserts that the uncontroverted evidence that its design complied with the FMVSS 301, requiring withstanding side impact

crashes at 20 mph, precluded any award for punitive damages. In *Stone Man v. Green*, 263 Ga. 470, 472 (435 SE2d 205) (1993), the Supreme Court held that "punitive damages, the purpose of which is to 'punish, penalize or deter,' are, as a general rule, improper where a defendant has adhered to environmental and safety regulations," because such compliance *tends* to demonstrate the absence of wilful misconduct, malice, fraud, etc., necessary to assess punitive damages. However, nothing in *Stone Man* precludes an award of punitive damages where, notwithstanding the compliance with applicable safety regulations, there is other evidence showing culpable behavior.

In the instant case, there was evidence that GM was aware of the problems inherent with placement of the fuel tanks outside the frame on its full-size pickup trucks, which exposure could have been significantly reduced by application of a steel shield around the tank, or by using retaining straps with rounded edges, yet it did not implement such modifications because of economic considerations. This evidence of a knowing endangerment of all who may come in contact with one of the 5,000,000 GM full-size pickup trucks still on the road, motivated by economic benefit, was sufficient to support an award of punitive damages. *Mack Trucks v. Conkle*, supra at 544.

(b) GM also contends that the jury's award of punitive damages was invalid because it constituted an impermissible extraterritorial award, which applied the Georgia Tort Reform Act beyond Georgia and which violated the Commerce Clause of the United States Constitution. During closing argument on the punitive damages claim, counsel for the plaintiffs asked the jury to award $20 for each of the 5,000,000 GM pickup trucks with side saddle fuel tanks that were still on the road. The $101,000,000 verdict suggests that the jury applied that equation. However, GM's argument overlooks the fact that any of those 5,000,000 remaining trucks could be driven into the state at any given time. For that reason alone, we do not regard the jury's award as extraterritorial in scope.

(c) Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U. S. 1, 21 (111 SC 1032, 113 LE2d 1) (1991). In the instant case, GM concedes that the proportion of punitive damages to compensatory damages is not dispositive, but nevertheless contends that the proportion in the instant case, i.e., 101,000,000 to 1, demonstrates the excessiveness of the award.

In *Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. 613 (1) (409 SE2d 501) (1991), the Supreme Court held that the concept of proportionality as a legal limitation on the amount of punitive damages did not apply where the award was meant as a deterrence. The Court further noted that "[w]hile the Supreme Court in *Haslip* ana-

lyzed the punitive damages award by comparing it to the actual award, nothing in the opinion mandates such a comparison." Id. at 615.

Pursuant to OCGA § 51-12-5.1 (e) (1), there is no limitation as to the amount that may be awarded as punitive damages. However, "[o]nly one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission." Id. Considering the public nature of the harm in this case, the corporate defendant herein involved, and the protection afforded by the statutory "one award" provision, the amount of the punitive damages assessed against GM was not unreasonable and rationally served the purpose of punishing and deterring.

(d) GM also contends that the trial court erred in its instructions to the jury by refusing to define the "clear and convincing evidence" standard of proof required for punitive damages. We agree.

GM requested that the trial court instruct the jury that "as to the issue of punitive damages, the plaintiff must prove that the plaintiff is entitled to relief by clear and convincing evidence to a reasonable certainty. There is a higher burden of proof than the mere preponderance of the evidence." The trial court, however, refused that request and only gave the pattern charge on punitive damages, which contained no definition of clear and convincing evidence. During its deliberations, the jury requested clarification of the criteria for awarding punitive damages and the trial court repeated the pattern charge but again refused to define clear and convincing evidence as requested by GM.

In *Clarke v. Cotton*, 207 Ga. App. 883, 885 (429 SE2d 291) (1993), this Court considered the identical charge requested by GM in the instant case, and concluded that it was "argumentatively incomplete," as it did not define the parameters of that intermediate standard of proof. On certiorari, however, the Supreme Court disagreed and held that where, as here, two different standards of proof apply (preponderance of the evidence for compensatory damages, clear and convincing evidence for punitive damages), "even in the absence of a request to charge . . . the court is obligated to define both standards to avoid misleading or confusing the jury." *Clarke v. Cotton*, 263 Ga. 861, 862 (440 SE2d 165) (1994).

In *Clarke*, the Supreme Court noted that the "to a reasonable certainty" portion of the requested charge was an incorrect statement of the law, and thus it was properly refused. However, the Court further observed that the portion of the requested charge defining clear and convincing evidence as greater than the preponderance of the evidence standard was a correct statement of the law, and indicated that

it would have been preferable for the trial court to have given that incomplete charge rather than giving no charge at all. Id.

In the instant case, in view of the repeated requests for such by GM and the jury's apparent confusion over the issue of punitive damages, the trial court erred in refusing to define for the jury the clear and convincing standard of proof. Further, although the evidence supporting an award of punitive damages was sufficient, it was not overwhelming, and the omission may not be dismissed as harmless error. Id.

9. Under OCGA § 51-12-5.1 (d) (1) and (2), in any case where punitive damages are sought, the trier of fact must first determine whether an award of such is appropriate, and then, if it is found that the evidence authorizes an award of punitive damages, the trial is to be recommenced to take evidence for the jury to consider in deciding the amount of the award. " 'Thus, in regard to the adjudication of issues concerning the recoverability and amount of punitive damages in a tort case, OCGA § 51-12-5.1 made a bifurcated trial mandatory, whereas it had previously been discretionary with the trial court.' [Cit.]" *City of Monroe v. Jordan*, 201 Ga. App. 332, 334-335 (411 SE2d 511) (1991). The trial court observed that mandatory bifurcation in this case.

In certain circumstances, however, that bifurcated procedure may be inadequate to avoid confusing the jury in its determination of the issues of compensatory damages and punitive damages. That is, evidence appropriately admitted to show the propriety of punitive damages may influence the jury in deciding the issue of liability for compensatory damages. Further, any reversible error in the admission of evidence pertaining to the entitlement to punitive damages makes it difficult, if not impossible, to affirm a judgment on the compensatory claim, when both claims are litigated in the same phase of the trial. In such situations, it may be advisable to employ a trifurcated procedure, wherein compensatory damages are litigated in the first phase of the trial; the propriety of punitive damages is litigated in the second phase; and the amount of punitive damages to be awarded is litigated in the third phase of the proceeding.

In the instant case, during the phase of the trial designated for taking evidence regarding the amount of punitive damages to be awarded, the parties argued but presented no additional evidence. There was no need to do so, because all the evidence regarding punitive damages was admitted during the first phase of the trial in which the claim for compensatory damages was litigated. In this situation, notwithstanding the bifurcated procedure, it is difficult to envision the jury not being improperly influenced in its determination of GM's liability for compensatory damages by the infusion of evidence pertaining to the punitive damages issue. The problem, of course, was

compounded by the erroneous admission of certain evidence on the issue of punitive damages, such as the inflammatory references to a multitude of other lawsuits. As a consequence of that intermingling of evidence and issues, the judgment for the compensatory damages must fall with the judgment for the punitive damages. A trifurcated procedure could have eliminated this danger of issue confusion and possibly avoided the necessity of retrying the entire matter.

As discussed above, even prior to the enactment of OCGA § 51-12-5.1, the trial court had the discretion to bifurcate trials when such would promote the convenient resolution of the issues. *City of Monroe v. Jordan,* supra. Trifurcation likewise would fall within a trial court's discretion to sever the trial of the issues. See *Hayes v. Gary Burnett Trucking,* supra at 695. Other jurisdictions have utilized such a procedure when it avoided confusion of issues in the case and no party was prejudiced by the severance. See *Myers v. Celotex Corp.,* 594 A2d 1248 (Md. App. 1991); *Coughlin v. Owens-Illinois,* 27 Cal. Rptr. 2d 214 (1993).

It should be noted that where both negligence and strict liability are asserted as theories of recovery, and evidence of subsequent remedial measures is presented to prove the latter theory, it may be necessary to subdivide the second phase of such a trifurcated proceeding. In that situation, because evidence of subsequent remedial measures is inadmissible in negligence actions, the negligence claim would be litigated first, and then, if liability is found by the jury applying that theory, the matter would proceed to the third phase to determine the amount of the punitive damages award. However, if no negligence is found, then evidence pertaining to the strict liability claim would be presented, including any evidence of subsequent remedial measures. This subdivision of the second phase would eliminate any confusion of the two theories of recovery, and would not require any significant duplication of effort in the presentation of evidence. Further, even in negligence actions, after liability has been established during the first phase, evidence of subsequent remedial measures may become relevant and admissible to show the appropriate degree of deterrence or punishment.

## Case No. A94A0827

10. In their cross-appeal, the plaintiffs contend that the trial court erred (1) in denying their motion for new trial on the claim for pain and suffering, and (2) in striking the award for prejudgment interest which had been based on a combination of the compensatory and punitive damages. Our disposition of Case No. A94A0826, requiring retrial of the entire matter, renders moot the plaintiffs' cross-appeal from the denial of their motion for new trial. However, we ad-

dress the issue of prejudgment interest, as it may recur upon retrial.

When the trial court entered judgment on the jury's verdict, it originally assessed prejudgment interest in the amount of $1,568,223.86. Subsequently, however, the trial court struck that assessment, on the ground that the award of punitive damages may not be counted in determining whether the judgment exceeded the plaintiffs' unliquidated damages demand of $5,000,000.

OCGA § 51-12-14 (a) provides that "[w]here a claimant has given written notice by registered or certified mail to a person against whom claim is made of a demand for an amount of unliquidated damages in a tort action and the person against whom such claim is made fails to pay such amount within 30 days from the mailing of the notice, the claimant shall be entitled to receive interest on the amount demanded if, upon trial of the case in which the claim is made, the judgment is for an amount not less than the amount demanded." This statute serves as "a coercive tool to offset injury and financial loss by encouraging a tortfeasor to make amends for his injurious conduct by making immediate payment short of litigation." *Williams v. Runion*, 173 Ga. App. 54, 60 (325 SE2d 441) (1984).

The purpose of prejudgment interest is to compensate the injured party for the delay in receiving money damages. *Underwater Devices v. Morrison-Knudsen Co.*, 717 F2d 1380, 1389 (Fed. Cir. 1983); *Pino v. Protection Maritime Ins. Co.*, 490 FSupp. 277, 280 (D. Mass. 1980); *Marks v. Sanzo*, 345 SE2d 263, 267 (Va. 1986). Punitive damages, however, are intended to punish, penalize, or deter a defendant, *Mack Trucks v. Conkle*, supra. It follows that awarding prejudgment interest on punitive damages would not further the purpose of OCGA § 51-12-14 (a).

Decades before the enactment of OCGA § 51-12-14 (a), the Supreme Court held that "[i]n a case of tort, when the law allows the recovery of exemplary damages, *the allowance of which and the amount thereof being entirely in the discretion of the jury*, we do not think that the law contemplates or will allow interest to be computed on the sum awarded by them." (Emphasis supplied.) *Ratteree v. Chapman*, 79 Ga. 574, 581 (4 SE 684) (1887). We find nothing in the statute requiring deviation from that rule. See also *Barbush v. Oiler*, 158 Ga. App. 625 (281 SE2d 359) (1981). Accordingly, the trial court properly considered only the judgment for compensatory damages in determining whether the plaintiffs were entitled to prejudgment interest.

*Judgment reversed in Case No. A94A0826; judgment dismissed as moot in part, affirmed in part in Case No. A94A0827. Birdsong, P. J., concurs. Senior Appellate Judge Harold R. Banke concurs specially.*

Judge Harold R. Banke, concurring specially.

On motion for reconsideration, I have been persuaded that the punitive damages award in this case was untenable as the product of an inflamed jury. Accordingly, I cannot concur with the portion of Division 8 of the opinion that even reluctantly approves of the amount of the punitive damages awarded.

This case demonstrates in dramatic fashion the inadequacy of the current method of determining punitive damages in Georgia. Under OCGA § 51-12-5.1, punitive damages are awarded solely to punish, penalize, or deter the defendant. The size of an award of punitive damages is generally left to the "enlightened conscience" of the jury, and the jury's award will not be disturbed on appeal unless it is so excessive or inadequate as to shock the "judicial conscience." *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 766 (386 SE2d 120) (1989).

The United States Supreme Court has indicated that punitive damages must be reasonable in amount and rationally serve the purpose for which they are awarded; in applying that standard, it approved a review process that compared the punitive damages award to the compensatory award. See *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U. S. 1, 21 (111 SC 1032, 113 LE2d 1) (1991). However, our own Supreme Court has rejected the concept of proportionality where the punitive damages award is intended as a deterrence. *Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. 613 (409 SE2d 501) (1991).

As a result, there is a great dearth of objectivity in the analysis or evaluation of punitive damages awards in Georgia. Our law provides much platitude and little guidance for determining an award of punitive damages. See *Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. at 616. So long as the subjective exercise of a jury's or a judge's "conscience" remains the operative standard in assessing or reviewing an award of punitive damages, questions of excessiveness or inadequacy will continue to arise in cases involving punitive damages.

In the instant case, the trial was conducted in an ostensibly inflamed atmosphere, with counsel repeatedly introducing the inflammation by frequent reference to other incidents of post-collision fuel-fed fires, in violation of the order on the motion in limine by not first showing the requisite similarity. The motion for reconsideration suggests that this court is either irrational or subhuman. The merits of this case deserve more level-headed consideration than that advocated by Moseley's counsel.

Inasmuch as the award for punitive damages in this case necessarily falls with the reversal of the judgment on the various evidentiary grounds, the opinion's analysis of the propriety of the punitive damages is dictum, or perhaps even advisory. Nevertheless, to the extent that any discussion of this issue is appropriate in this appeal, upon

further reflection I conclude that the amount of punitive damages awarded should not be upheld in this case because it was the product of an inflamed, rather than enlightened, jury.

DECIDED JUNE 13, 1994 —
RECONSIDERATIONS DENIED JULY 14, 1994.

*King & Spalding, Griffin B. Bell, Frank C. Jones, Byron Attridge, Chilton D. Varner, Philip E. Holladay, Jr.,* for appellant.

*Michael J. Bowers, Attorney General, Michael E. Hobbs, Deputy Attorney General, Butler, Wooten, Overby & Cheeley, James E. Butler, Jr., Robert D. Cheeley, Patrick A. Dawson, Albert M. Pearson III, Andersen, Davidson & Tate, Gerald Davidson, Jr.,* for appellees.

*Alston & Bird, James C. Grant, Robert D. McCallum, Jr., G. Conley Ingram,* amici curiae.