A99A2324, A99A2325. MILLS et al. v. NORFOLK SOUTHERN RAILWAY COMPANY; and vice versa.

(526 SE2d 585)

ELDRIDGE, Judge.

This case comes on appeal after the trial court granted a new trial on special grounds to Norfolk Southern Railway Company[1] on the train-vehicle collision that occurred when the automatic warning devices at the crossing failed to timely activate before the vehicle entered the crossing. The special ground for the grant stated that testimony as to prior notice of the gravity of danger from activation failures of automatic crossing warning devices, evidenced by similar occurrences, should not have been admitted, because each such occurrence had not been shown to be substantially similar by a separate evidentiary foundation for each occurrence. Federal regulations, however, mandated that all automatic warning devices provide the same minimum standard of configuration and performance for all such automatic warning devices at all crossings so that each performs the same. See 49 CFR § 234.1;[2] 59 FR 50105. Thus we hold that all the prior similar occurrences had sufficient substantial similarity to the activation failure in this case to be relevant and material for admission into evidence, because all automatic warning devices had to perform to a minimum federal standard, creating substantial similarity in function as to all other automatic warning devices, as well as to the duty of the train crews when a failure occurred. See 49 CFR § 234. The trial court's grant of a new trial on this special ground requires reversal as a matter of law.

## Case No. A99A2324

James William Mills and Lorraine Mills Stephens[3] brought this

---

[1] Formerly known as Southern Railway Company.

[2] 49 CFR § 234.1 reads:

[t]his part imposes minimum maintenance, inspection, and testing standards for highway-rail grade crossing warning systems. This part also prescribes standards for the reporting of failures of such systems and prescribes minimum actions railroads must take when such warning systems malfunction. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part.

[3] Executrix for the estate of Vanlie Pearl Mills, as administratrix d.b.n. for the estates of Christopher and Patrick Mills.

wrongful death action. The collision killed Christopher Mills and Patrick Mills, the minor children of James and Vanlie Pearl Mills, now deceased.

1. Appellants' first enumeration of error is that the trial court erred in granting Norfolk Southern's motion for new trial on the special ground that the trial court erred in admitting evidence of prior notice of the existence and gravity of danger at the first trial. We agree and reverse, vacating the order, and order the trial court to reinstate the original judgment.

The wrongful death action involved issues of negligence and causation based upon the malfunctioning of the railroad's grade crossing warning system through negligent maintenance together with the negligent failure of the train crew to keep a proper lookout, to sound the horn in warning, and to slow down when approaching the crossing when such malfunction became apparent to the train crew from the absence of flashing warning lights at the crossing, indicating an activation failure.[4]

The crossing was controlled by an "active" warning system that should have activated lights, bells, and a gate arm when the train approached within the range of the sensors. The failure to observe timely the absence of warning signals at the crossing evidenced the train crew's inattention. The failure of engineer Hick to sound the horn as the train approached the crossing further evidenced his failure to observe the blow post, which warns of the approach to the crossing and indicates when to blow the horn.

A high fence blocked Mills' view of the approaching train as he approached the crossing. The vehicle entered the crossing just as the lights began to flash but before the gate came down; Mills could not stop and continued into the crossing, where the train then struck the vehicle. The collision also occurred before the gates came down to prevent entry onto the crossing. The fact that the gates came down after the train entered the crossing evidenced the delayed activation failure of the automatic warning system. Under federal regulations, the warning lights must flash at least. twenty seconds prior to the arrival of the train and the gate must begin to descend at least three seconds after the lights begin to flash and close at least five seconds before the train arrives.[5]

Despite the federal regulations that an active warning system

---

[4] 49 CFR § 234.5, Definitions.
As used in this part: "Activation failure" means the failure of an active highway-rail grade crossing warning system to indicate the approach of a train at least 20 seconds prior to the train's arrival at the crossing. . . . (This failure indicates to the motorist that it is safe to proceed across the railroad tracks when, in fact, it is not safe to do so.)

[5] 49 CFR §§ 234.223, Gate arm; 234.225, Activation of warning system.

must activate warning devices 20 seconds before the train enters the crossing and the automatic warnings have 3.5 to 4 seconds of flashing lights and bells, followed by the descent of the gate over the next 20 seconds, this automatic warning system failed to meet such minimum federal standards. 49 CFR § 234.5; 56 FR 33728. Under the regulations, the bells stop, but the gate must be completely down with the lights flashing when the train enters the crossing. When the train exits the crossing, the lights stop flashing immediately and the gates go up.

In this case, the facts all fit a delayed activation failure. A "delayed activation failure" occurs when the warning is activated late by the train after it passes the sensor so that the train reaches the crossing before the gates go down and before motorists can receive a proper warning of the approach of the train. See 49 CFR § 234.5; 56 FR 33728. Delayed activation failures result from short circuits in the track circuit monitored by warning system control devices; this type of failure is called a "shunt." Track circuits consist of the crossing and track approaches in both directions from the crossing. A short shunt registers on the warning system as a train, activating the warning devices. When the shunt does not move for 20 seconds, the control device releases the warning devices at the crossing, which acts as if the train just exited the crossing. The lights, bells, and gates immediately cease operation. The control device continues to search for trains down both lengths of track for approaching trains; however, the control device can search down the prescribed length of track in only one direction. If there is a standing shunt, the control device cannot search beyond the shunt's location for an actual train. The control device cannot sense a train until it crosses a standing shunt. The standing shunt delays the activation of warning devices and results in a false "all clear."[6]

Plaintiffs used several kinds of evidence to prove a delayed activation failure caused the deaths in the train-vehicle collision: (1) post-impact physical evidence at the scene, which showed that the gate arms were not down at impact between the train and vehicle; (2) the witnessed operation of the warning system immediately after the train exited the crossing after the collision, demonstrating a continuing failure; and (3) maintenance records for the warning system at the crossing, showing delayed activation failures occurring on an intermittent basis before the time of the collision. From the train crew, plaintiffs also presented evidence of similar occurrences to establish the foreseeability of this danger, the duty to exercise ordinary care, and causation.

---

[6] See 49 CFR §§ 234.5; 234.9; 234.105; 234.107; 234.223; 234.225.

Maintenance records for this crossing kept by signal maintainer Jones showed that between the inspections in December 1987 and January 1988 that a "false alarm" malfunction occurred. Delayed activation failures are first proceeded by "false alarm" malfunctions. Norfolk Southern's training and instruction materials stated that a signal maintainer must look for and correct the cause of prior "false alarm" malfunctions, even if they clear up, because the condition may deteriorate into a delayed activation failure. Jones failed to do this before the collision. Thus maintenance did not discover and correct the cause of the delayed activation failures prior to the collision.[7]

Routine inspections of this warning system after the collision showed that delayed activation failures had chronically occurred prior to the collision. This indicated that delayed activation failures had occurred on an intermittent basis at the time of the collision. Thus, plaintiffs made out a prima facie case that there was a delayed activation failure at the time of the train-vehicle collision and a failure to maintain by the railroad, which caused the warning devices at the crossing not to work timely.

To prove the liability of Norfolk Southern, plaintiffs proved the negligent maintenance of the crossing warning signals with a delayed activation failure and proved the negligent acts and omissions of the train crew in not keeping a proper lookout, in not blowing a warning of the train's approach, and in not appropriately reducing speed when approaching this dangerous crossing when they knew or should have known that a delayed activation failure existed at the crossing, because the warning lights had not flashed and the gate had not descended. Such negligent failure to react appropriately in reducing speed, blowing the horn, and keeping a proper lookout to a delayed activation failure depended upon the foreseeability of the general consequences and danger to the public from the warning signal's failure at any crossing with any automatic warning equipment with a short shunt, regardless of the design, manufacture, or configuration. The amount of time that a warning system must operate and the sequencing before a train enters a crossing have been mandated for all automatic systems, all circumstances, and all railroads by federal regulations, so that there exists substantial similarity in function and requirements as a matter of federal regulations for purposes of uniformity. See 49 CFR § 234. Therefore, the specific control device, signal warning equipment, wiring sensor, and defect had nothing to do with the duty of the train crew under all circumstances where a delayed activation failure occurred, because the train crew's duty was the same in all cases, i.e., slow the approach speed, blow the

---

[7] 49 CFR §§ 234.9; 234.247-234.273.

horn, and keep an appropriate lookout approaching the crossing, with any and all equipment and defects at any crossing experiencing a delayed activation failure/short shunt.[8] All delayed activation failures, no matter what defect, control device, circuitry, or warning system used, have the same effect on the motorist and pose the same inherent dangers to the motorist, requiring the same duty of care by the train crew. See 49 CFR § 234. Therefore, the train crew would be under the same standard of care toward a motorist no matter which automatic warning system was used where there was a delayed activation failure.

The substantial similarity standard for admission of evidence of prior substantially similar occurrences had been satisfied in this case, because this was a standard of care under the same or similar circumstances required by federal regulations. 49 CFR § 234.[9]

The dangerous character or condition of a grade crossing, as evidenced by prior train-vehicle collisions at the crossing, has long been admissible to establish the duty of the train crew when approaching such dangerous crossing and requires for admission in evidence only

---

[8] In regard to duty of care under the same or similar circumstances in nonproduct liability cases, the existence of a blind, dangerous crossing, requiring automatic warning systems, all have similar equipment, i.e., an automatic sensing device to activate the warning system, connecting circuits, control sensor, and warning devices. Any delayed activation failure causes the warning system to act similarly; therefore, there existed sufficient similarity for such evidence to be probative. See *Cochran v. Lowe's Home Center*, 226 Ga. App. 417, 418-419 (487 SE2d 50) (1997); *Wright v. Dilbeck*, 122 Ga. App. 214, 217 (4) (176 SE2d 715) (1970); see also *Skil Corp. v. Lugsdin*, 168 Ga. App. 754, 756 (1) (309 SE2d 921) (1983). See *Ga. Cotton Oil Co. v. Jackson*, 112 Ga. 620, hn. 4 (37 SE 873) (1901).

> While the relevancy of other occurrences is ordinarily within the sound discretion of the court, "it is necessary that the conditions of the things compared be substantially similar." Green, Georgia Law of Evidence, p. 172, § 68. Without a showing of substantial similarity, the evidence is irrelevant as a matter of law and there is nothing upon which the court's discretion can operate. [Cits.]

*Carlton Co. v. Poss*, 124 Ga. App. 154, 155 (3) (183 SE2d 231) (1971); see also *Hayes v. Gary Burnett Trucking*, 203 Ga. App. 693, 694 (1) (417 SE2d 676) (1992), overruled on other grounds, *Patterson v. Lauderback*, 211 Ga. App. 891, 893 (440 SE2d 673) (1994); *Cooper v. Baldwin County School Dist.*, 193 Ga. App. 13, 14 (1) (386 SE2d 896) (1989).

[9] Even the requirements of *Gen. Motors Corp. v. Moseley*, 213 Ga. App. 875, 877-878 (1) (447 SE2d 302) (1994), i.e., that there be evidence showing that prior similar occurrences had sufficient substantial similarity to the case for admission to prove notice of the general danger, giving rise to foreseeability and to the duty of care, had been satisfied in this case when evidence established as to the other occurrences that the automatic warning system at the crossing came under federal regulations by being at public road crossings, that there was a public railroad crossing, and that there had been a delayed activation failure. See as to the stricter substantially similar defects requirement in product liability cases in general *Mack Trucks v. Conkle*, 263 Ga. 539, 544 (3) (436 SE2d 635) (1993). See also *Harley-Davidson Motor Co. v. Daniel*, 244 Ga. 284, 286 (2) (260 SE2d 20) (1979); *Uniroyal Goodrich Tire Co. v. Ford*, 218 Ga. App. 248, 258 (5) (461 SE2d 877) (1995), rev'd on other grounds, *Ford v. Uniroyal Goodrich Tire Co.*, 267 Ga. 226 (476 SE2d 565) (1996); *Browning v. Paccar, Inc.*, 214 Ga. App. 496, 498 (1) (a), (b) (448 SE2d 260) (1994); cf. *Cochran v. Lowe's Home Center*, supra at 418-419.

that the collision be of the same or similar circumstances, i.e., a crossing, prior occurrences, a train, a vehicle, and a collision or, as here, the additional facts of an automatic warning system and a delayed activation failure. *Norfolk Southern R. Co. v. Thompson*, 208 Ga. App. 240, 248 (7) (430 SE2d 371) (1993); *Wright v. Dilbeck*, supra at 216-217; *Louisville &c. R. Co. v. Bean*, 49 Ga. App. 4, 5 (1) (a), (b) (174 SE 209) (1934).

In this case, train crew member Dale Hamilton testified regarding his experiences with automatic warning devices that had delayed activation failures, and this experience established the duty of care under such circumstances based upon previous knowledge and appreciation as to the inherent danger by an experienced train crewman. The trial court erred as a matter of law in finding that, without a separate evidentiary foundation as to substantial similarity for each occurrence being first laid, such prior occurrences had been erroneously admitted;[10] in determining that the testimony of Hamilton was harmful error requiring a new trial; and in granting a new trial on such special ground, because such foundational requirement had been fully satisfied. The trial court ignored that the federal regulations made all crossing warning system failures from a delayed activation failure substantially similar, because the standard of performance for each warning system had the same requirements, and the duty of the train crew imposed the same standard of care.

2. Appellants' remaining enumerations of error are moot.

### Case No. A99A2325

3. While Norfolk Southern moved for new trial on special grounds or, in the alternative for judgment notwithstanding the verdict, the trial court ruled on some grounds but did not rule on the two issues presented in Norfolk Southern's cross-appeal on the motion for j.n.o.v. "The grant of a new trial on grounds specified in the judge's order in effect overrules others not passed on, which omission on the part of the trial judge may be assigned as error in a cross-[appeal] filed by the movant. [Cits.]" *Selman v. Manis*, 100 Ga. App. 422, 425 (1) (111 SE2d 747) (1959). See also *Allen v. Schweigert*, 113 Ga. 69, 74 (4) (38 SE 397) (1901). The grant of a new trial in effect overruled the grounds not passed upon on motion for j.n.o.v. See *Selman v. Manis*, supra at 425.

Norfolk Southern contends that the trial court erred in denying its motion for j.n.o.v. on the plaintiffs' claim of negligent maintenance of the crossing signal equipment, because plaintiffs allegedly presented no probative evidence showing that negligence in the care

---

[10] See 49 CFR § 234.5; 56 FR 33723.

or maintenance of the equipment in question proximately caused a signal malfunction. We do not agree.

> [A] directed verdict is appropriate only if there is no conflict in the evidence as to any material issue and the evidence introduced, construed most favorably to the party opposing the motion, demands a particular verdict. OCGA § 9-11-50 (a); *Norfolk Southern Corp. v. Smith*, 262 Ga. 80, 82 (2) (414 SE2d 485) (1992). The same standard applies to a motion for judgment notwithstanding the verdict. See *Goggin v. Goldman*, 209 Ga. App. 251, 252 (433 SE2d 85) (1993).

*St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1) (508 SE2d 646) (1998). "In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. The standard for directed verdict and judgment n.o.v. are identical." (Citations and punctuation omitted.) *Outdoor Systems v. Woodson*, 221 Ga. App. 901 (1) (473 SE2d 204) (1996).

In this case, plaintiffs established that there had been a false alarm prior to the last inspection; that Jones failed to determine the cause and fix it prior to the collision; that false alarms precede delayed activation failures; that there had been a record of delayed activation failures at this crossing both prior and subsequent to the collision; that the physical evidence at the collision scene evidenced a delayed activation failure; that the engineer did not slow the train down although there was a delayed activation failure at the crossing; and that a collision occurred. Such evidence was sufficient to require the trial court to deny the motion for j.n.o.v. See *Sims v. Sims*, 265 Ga. 55, 56 (452 SE2d 761) (1995); *Horton v. City of Macon*, 144 Ga. App. 380, 381-382 (2) (241 SE2d 311) (1977). There was some evidence to support the verdict on this issue.

4. Norfolk Southern contends that the trial court erred in not granting j.n.o.v. as to the negligent violation of OCGA § 46-8-150. We do not agree, because federal regulations did not preempt state law at the time of the collision and a causation issue arose from the evidence.[11]

---

[11] On June 19, 1991, after the collision in 1988, 49 CFR § 240 was amended and was again amended on April 9, 1993. See 56 FR 28254; 58 FR 19002. After the amendments, 49 CFR § 240.5 (a) reads:
> [b]y issuance of these regulations, FRA intends to preempt any State law, rule, regulation, order, or standard covering the same subject matter [(the minimum qualification of engineers)] in accordance with the provisions of section 205 of the Federal Railroad Safety Act of 1970 (45 U. S. C. 434).

There had been no assertion of federal preemption prior to June 19, 1991, as evidenced by the necessity to assert it after the collision.

(a) Norfolk Southern seeks to raise issues in its brief that it did not independently enumerate as errors, i.e., that the trial court erred in failing to rule on its motion for j.n.o.v. and that the case proceeded to the jury on an improper or unsupported theory of liability. Failure to properly enumerate such alleged errors ordinarily waives such issues. *Sass v. First Nat. Bank of Cherokee*, 228 Ga. App. 7, 8 (2) (491 SE2d 76) (1997); see also *Brown v. Brown*, 237 Ga. 201, 202 (227 SE2d 360) (1976); *Jardine v. Jardine*, 236 Ga. 323 (1) (223 SE2d 668) (1976); *Ware v. State*, 232 Ga. App. 165, 166 (1) (500 SE2d 601) (1998). Nonetheless we will address such issues.

(b) At the time of the collision, OCGA § 46-8-150 established a state minimum standard for qualification to be an engineer through training, supervision, and experience over a three-year period before becoming an engineer. Norfolk Southern admits that its engineer did not satisfy the requirements of the statute, because he had only a year and one month of training before being made an engineer. Instead, he received on-the-job training to become an engineer under federal regulations, so that he had less than three years total training before the collision. See 49 CFR § 240 et seq.

Norfolk Southern contends that there has been a federal preemption of the Georgia statute by the subsequent federal regulation. Neither the regulations existing in 1988 nor the underlying federal statute either expressly or impliedly indicates that Congress had the intent to preempt state minimum standards for engineers prior to 1991.[12]

(c) Norfolk Southern contends that the violation of OCGA § 46-8-150 had no causal connection with the collision. Plaintiffs' evidence demonstrates, however, that the engineer did not blow the horn, did not see Mills' vehicle approaching the crossing, did not see the absence of flashing grade crossing lights, and did not reduce the train's speed when approaching the crossing where an observable delayed activation failure existed; that delayed activation failure was a known danger among experienced engineers and train crews; and that reduction of a train's speed, blowing the horn, and keeping a proper lookout were the appropriate ways to reduce the danger of an activation failure. Although the railroad's rules required a speed at this crossing of 40 mph, the engineer had the train at 42 mph as he approached the crossing where no signals flashed. See 49 CFR § 213.1. The engineer testified that he was traveling at between 37 and 38 mph before the collision; Hamilton, however, testified that the train slightly exceeded the speed limit. Norfolk Southern con-

---

[12] See 49 CFR § 240 et seq. While Norfolk Southern relies upon *State of Wis. v. Wis. Central Transp. Corp.*, 200 Wis. 2d 450 (546 NW2d 206) (Wis. App. 1996), this is persuasive authority as to federal law and the issue of preemption but is not conclusive.

tended that the train's speed at the time of collision was 30 mph. Had the engineer timely observed, through a proper lookout, that the warning lights had failed through an activation failure, then the engineer should have sounded the horn and stopped the train before the crossing to put down a crew member to act as flagman at the crossing and proceeded at 15 mph through the crossing.[13] Thus, lack of training, experience, and judgment had a causal connection with how this inexperienced engineer acted or failed to act under these facts and circumstances. OCGA § 46-8-150.

OCGA § 46-8-150 creates a minimal standard of training and experience established by the legislature; violation of such standard must be shown to be the proximate cause or a concurrent proximate cause of plaintiffs' damages. See *Keith v. Beard*, 219 Ga. App. 190, 192 (1) (464 SE2d 633) (1995); see also *Cannon v. Street*, 220 Ga. App. 212, 214 (3) (469 SE2d 343) (1996); *Walter v. Orkin Exterminating Co.*, 192 Ga. App. 621, 624 (3) (385 SE2d 725) (1989); *Sumner v. Otasco, Inc.*, 175 Ga. App. 177, 178 (2) (333 SE2d 28) (1985). Whether or not the violation of OCGA § 46-8-150 (a) was the proximate cause or concurrent proximate cause of plaintiffs' damages cannot be decided as a matter of law but depends upon the jury determination of causation, which they found through their verdict. *Ga. R. & Banking Co. v. Cook*, 94 Ga. App. 650, 652 (4) (95 SE2d 703) (1956); see as to concurrent proximate cause *Coleman v. Atlanta Obstetrics &c.*, 194 Ga. App. 508 (390 SE2d 856) (1990), aff'd, *Atlanta Obstetrics &c. v. Coleman*, 260 Ga. 569 (398 SE2d 16) (1990). Since the evidence was in dispute, then causation could not be decided either on directed verdict or j.n.o.v. The lack of training and experience in compliance with OCGA § 46-8-150 (a) under the circumstances cannot be ruled out as a concurrent causal factor in the failure to blow an approach warning and in the fatal speed and force of the collision when approaching a crossing and where the automatic warning system failed but went unobserved by the engineer. The jury could have found that an experienced engineer would have observed the vehicle in the crossing sooner, determined an emergency, i.e., an activation failure and vehicle in the crossing, and hit the emergency brake quicker, reducing the collision impact or avoiding the collision entirely. When a specific hazard exists, the engineer and train crew must make an "appropriate response" to avoid the danger. *Gay v. Sylvania Central R. Co.*, 79 Ga. App. 362, 367-368 (3) (53 SE2d 713) (1949). Thus, the duty to keep a proper lookout, blow an approach warning, and slow down for

---

[13] While 49 CFR § 234.105 (c) and (d) imposed such duties as of September 30, 1994, such minimum standards are some evidence of the standard of ordinary care by a reasonable, prudent, and experienced engineer under the same or similar circumstances in 1988. See 59 FR 50106.

a specific hazard of an activation failure with a vehicle in the crossing changed the maximum speed under federal regulations. See *Central of Ga. R. Co. v. Markert*, 200 Ga. App. 851, 852 (3) (410 SE2d 437) (1991); 49 CFR §§ 213.1; 234.105 (c) (2), (3).

The knowledge, training, and experience of an engineer to deal with such specific hazards come from service; thus, Hick's experience of less than three years was an appropriate issue of causation for the jury to consider. See OCGA § 46-8-150 (a); *Ga. R. & Banking Co. v. Cook*, supra at 650.

*Judgment affirmed in Case No. A99A2325. Judgment reversed and case remanded in Case No. A99A2324 with directions that the prior judgment be reinstated. Barnes, J., concurs. Blackburn, P. J., concurs in Divisions 3 and 4 and concurs in judgment only in Divisions 1 and 2.*

ON MOTION FOR RECONSIDERATION.

On motion for reconsideration, Norfolk Southern argues that reliance upon 49 CFR § 234.225 is misplaced, because it was not adopted until 1994, and the collision occurred in 1988. See 59 FR 3051 (1994). While it is true that these rules and regulations did not appear in the Federal Register until 1994, the substantial equivalent rules and regulations had governed railroad grade crossing signal devices since 1978 as approved by the Federal Highway Administrator as the National Standards for All Highways in unofficially published form and as the basis for such later rules and regulations. See 23 USCS §§ 109 (b), (d); 402 (a); 23 CFR § 1204. The Federal Railroad Administration through powers delegated by the Secretary of Transportation promulgated the Manual on Uniform Traffic Control Devices for Streets & Highways (MUTCD), which was not separately set forth in the Code of Federal Regulations but which was available through the Superintendent of Documents, U. S. Government Printing Office. 49 CFR Part 7, App. D; 23 CFR § 655.601 (a) (1990). The authority to promulgate such rules and regulations had been granted the Secretary under the Federal Railroad Safety Act of 1970. P.L. 91-458, 84 Stat. 971, 45 USCS §§ 431-441. The Secretary of Transportation adopted the MUTCD in 1983. See MUTCD §§ 8C-4; 8C-5; 8C-6. See also *Hatfield v. Burlington Northern R. Co.*, 757 FSupp. 1198, 1203 (D. Kan. 1991), rev'd on other grounds, 958 F2d 320 (10th Cir. 1992). In 1990, MUTCD was incorporated by reference into the Code of Federal Regulations. See 23 CFR § 655.601 (a) (1990).

49 CFR § 234.225 was adopted after nearly six years of hearings and study, beginning in 1988 under congressional mandate, with the same uniform performance criteria for all grade crossing warning systems as the MUTCD. P.L. 100-342, 102 Stat. 625, 45 USCS § 431

et seq.; 53 FR 47554 (1988); 54 FR 49 (1989); 54 FR 4319 (1989); 55 FR 38707 (1990); 56 FR 33722 (1991); 56 FR 61169 (1991); 57 FR 28819 (1992); MUTCD §§ 8C-4; 8C-5; 8C-6. On July 23, 1991, the Federal Railroad Administration adopted the Grade Crossing Signal System Information, 49 CFR § 234.225, but subsequently gave several extensions of the effective date until 1994. See 56 FR 33722; 56 FR 61169; 57 FR 28819.

While 49 CFR § 234.225 was not in force in 1988 at the time of the collision in that form, its core contained substantially the same performance criteria as rules and regulations that existed, governing Norfolk Southern, at such time but that did not appear in the Code of Federal Regulations; therefore, what was said regarding 49 CFR § 234.225 applied also to the MUTCD, that was the applicable rules and regulations, governing Norfolk Southern at the time of the occurrence.

*Motion for reconsideration denied.*

DECIDED DECEMBER 3, 1999 —
RECONSIDERATION DENIED FEBRUARY 11, 2000 — 

*Winburn, Lewis & Barrow, Gene Mac Winburn, John J. Barrow, Gambrell & Stolz, Irwin W. Stolz, Jr., Seaton D. Purdom*, for appellants.

*Nelson, Mullins, Riley & Scarborough, Richard B. North, Jr., Donald L. Swift III*, for appellee.