A95A0465, A95A0466. UNIROYAL GOODRICH TIRE COMPANY et al. v. FORD (two cases).

A95A0467, A95A0470. FORD v. UNIROYAL GOODRICH TIRE COMPANY et al. (two cases)

A95A0468, A95A0469. UNIROYAL GOODRICH TIRE COMPANY v. FORD et al. (two cases)

(461 SE2d 877)

ANDREWS, Judge.

Uniroyal Goodrich Tire Company, a Delaware corporation, and Uniroyal Goodrich Tire Company, a New York partnership in which the Delaware corporation is a general partner, (referred to as UGTC

unless otherwise necessary) appeal from judgments entered against them in these product liability cases, including $25 million in punitive damages.

This case had its genesis in a wreck in August 1989 involving the Fords' 1982 van which was equipped with UGTC-produced tires. Mrs. Ford, Jr. had originally purchased two new SP-7000 tires from NTW, also named as a defendant, in February 1988. One of the tires was returned to NTW and replaced with a new tire because of a vibration noticed by Mr. Ford, Jr., which NTW attributed to the tire being out of round. In August 1989, while returning from vacation on Interstate 85 with their sons, Frank (Ford III) and Doug, Mr. Ford, Jr., who was driving the van, again noticed an intermittent vibration while they were south of the Atlanta airport. Although the Fords discussed the vibration and possible causes, including a tire problem, they continued their trip. Near the North Druid Hills exit on I-85, they heard two thumps, the second of which caused Mr. Ford, Jr. to have to struggle with the steering wheel to control the van. The left rear tire had ruptured, causing the steel belt to wrap around the rear axle, totally immobilizing the van. Because they were in the third lane, one lane from the median, they did not exit the van, but remained in it while Mr. Ford, Jr. attempted to move the van and call for help on his C.B. radio. Several minutes later, the immobilized van was rammed from behind by a car driven by Parsons, who was killed by the impact. Frank Ford III suffered severe and permanent brain damage and Mrs. Ford a badly fractured leg.

These appeals involve two separate actions which were brought seeking to recover for these injuries. One action (case nos. A95A0468 and A95A0469) was brought against the defendants by Mr. and Mrs. Ford, Jr. for injuries suffered by Mrs. Ford, Jr. in the collision along with Mr. Ford, Jr.'s loss of consortium claim. An identical separate action (case nos. A95A0465 and A95A0466) was filed against the same defendants on behalf of the son, Ford III, for his injuries.

1. UGTC moved for consolidation of the two actions for trial before a single jury pursuant to OCGA § 9-11-42 (a). The plaintiffs refused to consent to consolidation, as required under the provisions of OCGA § 9-11-42 (a), and the trial court denied the motion. Thereafter, citing "the nature of the actions, their complexity, and the time requirements of the actions for trial," the trial court entered an order, sua sponte, ordering that a separate jury be empaneled to try each action and further ordering that both actions be simultaneously tried in the same courtroom with the juries in both actions simultaneously hearing all common evidence. Over UGTC's objection to this procedure, separate trials in both actions were simultaneously conducted in the same courtroom. Virtually all the evidence in the liability phase of both trials was simultaneously presented to both juries.

As the dissent correctly points out, although for the wrong reasons, it was error for the trial court to order this procedure over the objection of UGTC. That error, however, does not require reversal in this case.

Contrary to the dissent's conclusion, the trial court's order was not controlled by OCGA § 9-11-42 (a). Section 9-11-42 (a), which was adopted from Rule 42 (a) of the Federal Rules of Civil Procedure, governs consolidation of separate cases on the court's docket, or of issues within those cases, for trial before a single jury or trier of fact. This section and its provision that "the court may order a joint hearing or trial . . ." has never been interpreted as authority for ordering simultaneous trials before multiple juries in the same courtroom. See Wright & Miller, Federal Practice & Procedure, Vol. 9, Ch. 7, §§ 2381, 2382 (1995).

However, the consolidation provisions of OCGA § 9-11-42 (a) do provide guidance in addressing this issue. The primary purpose for consolidating separate actions for trial is the promotion of convenience and judicial economy in cases involving common questions of law and fact. Even in proper cases where judicial economy would be promoted, OCGA § 9-11-42 (a) clearly departs from the otherwise identical provisions of federal Rule 42 (a) by providing that consolidation may be ordered only if the parties consent. *Robinson v. Hall*, 177 Ga. App. 181 (338 SE2d 699) (1985), disapproved on other grounds, *Stenger v. Grimes*, 260 Ga. 838, 839 (400 SE2d 318) (1991). Similarly, the simultaneous trial of these actions before two juries, as ordered by the trial court, was prompted solely by considerations of judicial economy. This so-called dual or multiple jury procedure has been approved in numerous criminal cases in other jurisdictions as a means to avoid problems arising under *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968), and other general prejudice problems in joint criminal trials and as an economy measure. See *Velez v. State*, 596 S2d 1197, 1199-1200 (Fla. App. 3 Dist. 1992); *United States v. Hayes*, 676 F2d 1359, 1366-1367 (11th Cir. 1982); *Smith v. DeRobertis*, 758 F2d 1151 (7th Cir. 1985). In one civil case, the trial court ordered the simultaneous use of two juries in a complex air crash case as an economical means to apply the law of two different states to the evidence. *Martin v. Bell Helicopter Co.*, 85 FRD 654 (D. Colo. 1980).

Without condoning its use as an economy measure in a case of this type nor condemning it in general, we conclude that, like consolidation, the procedure should not be forced on any party in a civil case who does not consent to it. Accordingly, the trial court erred by ordering the procedure over the objection of UGTC. Nevertheless, since harm as well as error must be demonstrated to warrant a reversal, it must be shown how the procedure prejudiced the defendants in

this case.

The defendants claim that, due to the dual jury procedure, one jury was deprived of continuous access to the blown tire during its deliberations while the tire was being used by the other jury. Even though the tire could not be used by both juries at once, there is nothing in the record showing that this prejudiced the defense. Both juries had access to the tire at one time or another during their deliberations, and there is no indication that either jury requested and was denied access to the tire. Moreover, the defendants made no claim in the trial court that lack of continuous access to the tire by both juries was error.

The defense claim that they were prejudiced by being deprived of the chance to employ different strategies before separate juries in separate trials is unpersuasive. Once again, the defendants did not make this claim during the trial so that the trial judge could consider allowing the presentation of any such defenses to one jury at a time. And the defendants were apparently not concerned with possible conflicting defenses when they moved for consolidation of the two cases for trial before a single jury.

The defendants' allegations of "logistical difficulties" caused by the dual jury procedure, without any detailing of such difficulties or resulting prejudice, present nothing for review.

Lastly, the defendants claim that the inconsistent verdicts reached by the two juries with respect to punitive damages demonstrate that they were prejudiced by the dual jury procedure and require reversal. Although the inconsistency of the two verdicts was perhaps more dramatic because it occurred during the simultaneous trials of both cases, rather than in sequential trials before separate juries, two separate juries hearing the same evidence on the same issue may legally render inconsistent verdicts. *Stapleton v. Palmore*, 250 Ga. 259 (297 SE2d 270) (1982).

Since the defendants have not shown they were prejudiced as a result of the dual jury procedure ordered by the trial court, no reversal is required on this ground.

2. UGTC's fourth enumeration alleges that it was reversible error for the trial court to order the addition of new party defendants in both cases three days prior to trial without service of process and over the objections of the added defendants. We concur.

In the case brought on behalf of the son, Ford III, the plaintiffs concede that in October 1990, pursuant to a consent order, the B. F. Goodrich Company was dropped as the defendant and Uniroyal Goodrich Tire Company, a partnership ("the partnership" for purposes of this division), was substituted as the party defendant. The plaintiffs also concede that, in the separate action brought by Mr. and Mrs. Ford, Jr., the complaint named Uniroyal Goodrich Tire Com-

pany as a defendant. The Uniroyal Goodrich Tire Company, a Delaware corporation ("the corporation" for purposes of this division), was served with process through its corporate agent.

In granting the plaintiffs' motions to add parties, the trial court concluded that it was perfecting the style of the case and ordered that the corporation be added as a defendant in the action brought on behalf of Ford III and that the partnership be added as a defendant in the action brought by Mr. and Mrs. Ford, Jr. Neither the partnership nor the corporation was separately served with process in the actions to which they were added. Three days later, both cases were simultaneously tried before separate juries, and judgments were subsequently entered against the original and added defendants in both cases.

The trial court's action did not merely perfect the style of the case or correct a misnomer but added new parties to each action. See *Northgate Village Apts. v. Smith*, 207 Ga. App. 479, 481 (428 SE2d 381) (1993). The partnership and the corporation were distinct legal entities, neither of which had been previously named as a defendant or served in the actions to which they were added. A new defendant added by motion must be served with process in the usual way even if the added defendant has knowledge of the pending suit. *Stone Mountain Aviation v. Rollins Leasing Corp.*, 174 Ga. App. 35, 36 (329 SE2d 247) (1985); *Charming Shoppes &c. v. Parrish*, 214 Ga. App. 729, 730-731 (448 SE2d 781) (1994). A judgment against added parties is null and void where there has been no valid service or waiver of service. *DeJarnette Supply Co. v. F. P. Plaza*, 229 Ga. 625 (193 SE2d 852) (1972); see *Hap Farms v. Heard*, 209 Ga. App. 684, 685 (434 SE2d 118) (1993).

Here, the added defendants timely objected to the addition without service, so there was no waiver. Id. at 685. Moreover, the record does not support the plaintiffs' claims that the corporation and the partnership waived service by making general appearances in the cases to which they were added or that they otherwise consented to the jurisdiction of the court. Compare *Hap Farms*, supra at 685-686.

Although the plaintiffs claim that the similarly named corporation and partnership were not always clearly referred to during the litigation as separate entities, it is clear that the entity added as a defendant in the Ford III case was a corporation, not the partnership which had been properly served in that case. Also, the suit as originally filed by Mr. and Mrs. Ford, Jr. was served on a corporation, not the partnership added three days before trial. It was the responsibility of the plaintiffs to conduct an investigation to determine that the proper parties were named and served in each case. "Service on the proper party is the responsibility of the plaintiff, not the [party] accepting service." (Citation and punctuation omitted.) *Charming Shoppes*, supra at 730-731. In fact, the plaintiffs eventually recog-

nized the problem and sought to correct it by adding defendants. However, the required service was never accomplished.

Accordingly, the added defendants are not bound by the judgments entered in the cases in which they were not served. Moreover, since the judgments were joint as against both defendants in each case, including those defendants not served, the judgments are indivisible and must be reversed as to both co-defendants in each case. *Knox v. Landers*, 160 Ga. App. 1, 2 (285 SE2d 767) (1981); *Medlin v. Church*, 157 Ga. App. 876, 878 (278 SE2d 747) (1981); *Ammons v. Horton*, 128 Ga. App. 273 (196 SE2d 318) (1973).

3. Enumerations 20 and 22 deal with the award of punitive damages of $25 million in the son Franklin Ford III's suit, Case Nos. A95A0465 and A95A0466, and are addressed together. The jury in Mr. and Mrs. Ford, Jr.'s action, Case Nos. A95A0468 and A95A0469, concluded that the defendants were not liable for punitive damages. Since this issue is likely to recur on retrial, we address the punitive damages.

This punitive damage award must be reversed for two reasons.

(a) The trial court charged the jury that: "The statutory law of Georgia provides that in a tort case in which the cause of action arises from product liability, 75 percent of any amounts awarded as punitive damages, less a proportionate part of the cost of litigation, including reasonable attorneys' fees, shall be paid into the treasury of the state." UGTC excepted to this charge and contends on appeal that this was error requiring reversal of the punitive damages award.

The charge given was a correct statement of a portion of subsection (e) (2) of OCGA § 51-12-5.1. "The clearly stated purpose of [OCGA § 51-12-5.1] is to punish and deter the defendant in a tort action." *Mack Trucks v. Conkle*, 263 Ga. 539, 542 (436 SE2d 635) (1993). Subsections (e) (1) and (2) of the statute carry out this purpose with respect to the imposition of punitive damages in product liability actions and provide in general that, although there is no ceiling on the award of punitive damages, there may be only one such award against a defendant for any act or omission regardless of the number of causes of action that may arise from such act or omission, and that 75 percent of any such award will be paid into the state treasury. In discussing these limitations on the imposition of punitive damages under the statute in *Mack Trucks,* supra, the Supreme Court observed that they enforce "the legislature's stated intent that the purpose of the statute is to punish the defendant, and not to provide compensation or, in our view, a windfall to an individual plaintiff. Rather, we think that the purpose of this subsection is to authorize punishment of a defendant who has the potential to greatly damage society at large. The statute furthers this purpose by not allowing the first plaintiff to reach the courthouse with a product liabil-

ity lawsuit to reap a windfall from the punitive damages, but instead requiring that three-quarters of the punitive damages awarded be paid into the state treasury for the benefit of all Georgia citizens. Punishment and deterrence of the defendant being the purposes of the subsection, *it is insignificant under the statute that the plaintiff does not receive the full award.*" (Emphasis supplied.) Id. at 542.

It follows from the above analysis of the purposes of subsections (e) (1) and (2) that the sole concern of the jury under these subsections is to decide what amount of punitive damages will serve to punish and deter the defendant. It is no concern of the jury that the plaintiff will not receive the full award and that 75 percent of the award will be paid into the state treasury for the benefit of all Georgia citizens, including the members of the jury. It matters not a whit that some or all of the jurors may have already known that 75 percent of any award would be paid to the state, as the dissent contends. The point is that this information is not relevant to the jury's consideration of punitive damages. Instructing the jury that the state would receive 75 percent of any punitive damages awarded created a substantial risk that the jury was improperly influenced by this consideration to adjust its award of punitive damages in a manner which prejudiced the defendants. Accordingly, the instruction was harmful error requiring reversal of the award of punitive damages.

(b) There was no evidence in the record to support the jury's award of punitive damages. In order to award punitive damages under OCGA § 51-12-5.1 (b), there must be "clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." " 'Under OCGA § 51-12-5.1 (b) . . . it remains the rule that something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage. . . .' (Citations and punctuation omitted.) *Ivey v. Golden Key Realty*, 200 Ga. App. 545 (1) (408 SE2d 811) (1991). 'Mere negligence, although gross, will not alone (support) the recovery of punitive damages.' (Citations and punctuation omitted.) *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860, 861 (1) (389 SE2d 355) (1989)." *J. B. Hunt Transport v. Bentley*, 207 Ga. App. 250, 256 (427 SE2d 499) (1993).

Although there was evidence of quality control problems at the plant where the tire at issue was manufactured, the bottom line was that the design of this type of tire complied with regulatory requirements and there was no evidence that the SP-7000 tire had previously caused an injury.[1] See *Stone Man, Inc. v. Green*, 263 Ga. 470 (435

---

[1] In enumeration of error 13, UGTC contends that the trial court erred by admitting

SE2d 205) (1993) (punitive damages generally not available where defendant has complied with applicable regulations governing the conduct at issue). Nevertheless, compliance with applicable design regulations will not preclude an award of punitive damages where there is other evidence that the manufacturer engaged in a deliberate course of conduct which knowingly endangered those using the product. *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 884-885 (447 SE2d 302) (1994). But there is no such evidence of knowing endangerment in this case.

At best, the evidence shows continuing manufacturing and quality control problems at the plant, which were known to UGTC and which resulted in a higher than normal incidence of belt/tread separation problems with tires produced at the plant. However, there is no evidence that the SP-7000 tire at issue manufactured under these conditions had ever previously caused an injury. Thus, there is no clear and convincing evidence that UGTC was engaging in any type of "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences" by which it knowingly placed the plaintiffs or others in danger of the type of accident and serious injuries suffered in this case. Accordingly, the trial court erred by denying the defendants' motions for a directed verdict and judgment notwithstanding the verdict on punitive damages.[2]

4. Enumerations of error 5, 6, 7, and 8 concern the trial court's refusal to dismiss NTW even though it was fully released prior to trial, refusal to allow defendants to inform the jury as to NTW's true status in the case, and the trial court's charge to the jury on a claim that was applicable only to NTW, even though UGTC was the only

---

FMVSS 573, a federal regulation dealing with recall notification and self-reporting to the National Highway Traffic Safety Administration when a product manufacturer determines that its product line is defective. Because there was no specific showing the SP-7000 tire was subject to recall or that UGTC violated FMVSS 573 with regard to the SP-7000 tire, the trial court erred in admitting FMVSS 573 for the purpose of proving punitive damages.

[2] In reviewing a motion for directed verdict or judgment n.o.v., the trial judge and the appellate court have the same basic task. Both must determine as a matter of law whether the evidence was sufficient under the same standard: "If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." OCGA § 9-11-50 (a). The appellate court must decide whether the trial court was right or wrong in applying this standard. See Gregory, Georgia Civil Practice, p. 505, § 6-17 (1990). Although cases also hold that the "any evidence" rule is the standard of appellate review of the trial court's denial of a motion for a directed verdict (see *Mattox v. MARTA*, 200 Ga. App. 697, 698 (409 SE2d 267) (1991)), this should not be taken to imply that the appellate court will defer to the trial judge's determination if there is "any evidence" whatsoever to support it. The issue on appeal remains whether or not there is "any evidence" sufficient under the applicable standard. In the case of punitive damages, the standard of review must also be applied in conjunction with the requirement under OCGA § 51-12-5.1 (b) that the evidence must be "clear and convincing."

defendant named on the verdict forms.

(a) In enumeration of error 5, UGTC contends that the trial court erred in declining to dismiss NTW from the case. The record shows that on March 17, 1993, NTW entered into a Compromise Release Agreement with Franklin E. Ford III as to all of his claims against NTW. On that same date, NTW and Franklin Ford, Jr. and Claudia Ford entered into a Compromise Release Agreement. In these agreements, plaintiffs agreed to "release and discharge all claims" against NTW. NTW remained in the case, and on September 1, 1993, NTW cross-claimed against UGTC for indemnification. On January 18, 1994, UGTC subsequently cross-claimed against NTW for contribution. On March 10, 1994, the parties filed Dismissals with Prejudice as to both cross-claims. Because of the Compromise Release Agreements releasing NTW from all claims, UGTC and NTW filed a joint motion for dismissal of NTW. The trial court held a hearing on this motion on March 11, 1994. The trial court denied the motion to dismiss, basing its opinion on this court's holding in *Carney v. JDN Constr. Co.*, 206 Ga. App. 785 (426 SE2d 611) (1992). But, the appeal in *Carney* was the denial of a motion to transfer venue based on the plaintiff's settlement with one of the joint tortfeasors, not whether the trial court erred in refusing to dismiss a party against whom there were no longer any claims pending. See *Collipp v. Newman*, 217 Ga. App. 674 (458 SE2d 701) (1995). Further, the record in *Carney* shows that the settlement agreement, with the amount of the settlement edited from it, was introduced into evidence at trial. Where parties have entered into a definite settlement agreement, "the trial court should make the agreement the judgment of the court, thereby terminating the litigation." *Smith v. Haverty Furniture Co.*, 173 Ga. App. 447, 448 (326 SE2d 812) (1985) (quoting *Skinner v. Smith*, 120 Ga. App. 35, 36 (169 SE2d 365) (1969)). Further, once the release had been signed, the claims against NTW disappeared and there was no justification for not granting NTW's motion to dismiss when there was no longer any claim or controversy to be decided.

In addition, there is also the issue of the fundamental unfairness to UGTC inherent in forcing NTW to remain as a defendant, not defend at trial against any of the charges, and not inform the jury as to their status at trial. There is evidence in the record that plaintiffs' counsel unfavorably compared NTW to UGTC and implied that NTW had admitted liability. For example, in closing, plaintiffs' counsel made the following remarks about NTW: "But they're not bad people. I believe they're a good company. Not so for the other defendant." Also, "They're not disputing it. They're not going to make excuses. They're taking the responsibility." These comments were misleading and improper, especially since the settlement documents explicitly stated that NTW denied liability as to any claims against it.

Because the trial court refused to allow the settlement agreement to be introduced as evidence and refused to allow the parties to inform the jury of NTW's true status, the jury was given the mistaken impression that one of the defendants had admitted fault. Therefore, we find alternatively, with regard to UGTC's sixth and seventh enumerations, that if the trial court refused to dismiss NTW, it was error not to introduce the settlement agreement into evidence and allow the parties to inform the jury as to NTW's status in the case. As previously discussed, plaintiffs' counsel was allowed to create the impression that NTW had admitted liability, and this could have served only to unfairly influence the jury as to UGTC's liability.

(b) UGTC's eighth enumeration of error contends that the trial court erred in charging the jury on breach of warranty.[3] The claim for breach of warranty was applicable only to the dismissed claim against NTW. There was no breach of warranty claim against UGTC. The warranty charge given by the court was as follows: "Negligence is not an element of breach of warranty. If goods do not conform to the warranty, the seller's utmost care will not relieve him of liability." However, the juries' verdict forms did not provide for a verdict for or against NTW. Each jury returned a verdict solely as to UGTC. The Fords contend that the jury understood that the warranty claim was not against the manufacturer and could lie only against the seller. However, UGTC points out that it was referred to repeatedly as the seller of the tire. Therefore, it is highly probable that the jury applied the charge as to these warranty claims against UGTC. A charge which could confuse the jury as to the contentions of the parties and the real issues in the case is grounds for the granting of a new trial. *Overstreet v. Nickelsen*, 170 Ga. App. 539, 540 (317 SE2d 583) (1984); *Mitchell v. Gay*, 111 Ga. App. 867, 871 (143 SE2d 568) (1965). Here, the charge was clearly confusing as there was no provision for returning a verdict against NTW. The jury could easily have applied this charge to the claims against UGTC, thus allowing plaintiffs to recover against UGTC on a basis not authorized by law. *Overstreet*, supra; *Mitchell*, supra. Accordingly, the trial court erred in giving the jury the breach of warranty charge. These errors mandate reversal of both judgments.

5. Enumerations 9 through 11 allege error in the trial court's admission, over objections at trial as well as the denial of a pretrial mo-

---

[3] Appellees contend that this enumeration of error was not preserved for appeal because appellants did not object to the charge at the charge conference. However, after the jury charge, appellants specifically objected to the charge regarding breach of warranty and reiterated their position that NTW was not a proper party to the suit. That the objection was not made at the charge conference is immaterial. The requirement is that it must be made before the jury returns its verdict. OCGA § 5-5-24 (a).

tion in limine seeking exclusion, of evidence of recall notices of tires other than the SP-7000 (enumerations 9 and 10) and the study done by a UGTC employee of the number of "adjustments" (honored warranty claims) made for tires originating from the Tuscaloosa plant as well as several other plants (enumeration 11).

Under the facts of this case, such evidence should not have been admitted and was highly prejudicial to UGTC, and the motions in limine should have been granted in both cases as follows.

(a) The court's order disposing of the motions in limine ruled, regarding the tire recalls: "Granted in part, denied in part. The fact that recalls were issued will not be permitted. However, *plaintiffs will be permitted to introduce information contained in such recall memoranda for the limited purposes of impeachment and to establish defendant's UGTC's knowledge that vehicle vibration is symptomatic of impending belt separation.*" (Emphasis supplied.)

Although the tires subject to the recalls were manufactured by UGTC, they were not the SP-7000 tire, which had never been subjected to a recall. The first recall involved 16-inch "Edge" and "Trail Edge" light truck tires, which were of a different load range, size, and category from the 15-inch SP-7000. No showing was made that the tire type was in any way similar, nor was any showing made that the belt or tread separation occurred in a similar fashion.

The second recall was of the "Lifesaver" tire, a passenger tire. Again, there was no showing that the tire was similar to the SP-7000. Further, the defect for which this tire was recalled was a "maldistribution of tread rubber in the shoulder area." There was no evidence that such a maldistribution was in any way involved with the Ford accident or, in fact, had ever occurred in a SP-7000 tire.

"In product liability actions, evidence of other incidents involving the product is admissible, and relevant to the issues of notice of a defect and punitive damages, *provided there is a showing of substantial similarity. Mack Trucks v. Conkle*, [supra]. 'Without a showing of substantial similarity, the evidence is irrelevant as a matter of law. . . .' *Carlton Co. v. Poss*, 124 Ga. App. 154, 155 (183 SE2d 231) (1971). See also *Hayes v. Gary Burnett Trucking*, 203 Ga. App. 693 (1) (417 SE2d 676) (1992)." (Emphasis supplied.) *General Motors Corp. v. Moseley*, supra at 877 (1). OCGA § 24-2-2.

While, in *Moseley*, the trial court acknowledged the requirement of "substantial similarity," the court's order in this case denying the motion in limine and her oral overruling of UGTC's trial objections have totally disregarded this requirement, despite our previous holdings that such a requirement is a condition precedent to admissibility. *Harley-Davidson Motor Co. v. Daniel*, 244 Ga. 284, 286 (2) (260 SE2d 20) (1979) ("The recall letter is admissible as long as there is first introduced some independent proof that the particular product in

question suffered from the same defect. The recall letter alone is insufficient to create a jury issue of the presence of such a defect in the product." It may be relevant on the issue of whether the defect was present when the item left the manufacturer.); *Browning v. Paccar, Inc.*, 214 Ga. App. 496, 498 (1a, b) (448 SE2d 260) (1994) (Evidence of recall only admissible if "there is first introduced some independent proof that the particular product in question suffers from the same defect."); *Skil Corp. v. Lugsdin*, 168 Ga. App. 754, 756 (1) (309 SE2d 921) (1983) (Where evidence of recall of a separate model is involved, the showing of significant similarity is of particular importance. Here, the lower blade guards on several saw models were designed and operated similarly by a spring-loaded mechanism, and evidence was produced to show it).

Further aggravating this problem, the court allowed the plaintiffs to redact portions of the unrelated recall letters, removing any reference to "recall." Instead, the two bulletins are completely whited out with the exception of the bulletin numbers, dates, and the following heading: "Very Important Read Immediately! BULLETIN." The first states that "Belt separation may also cause moderate to severe vehicle vibration. Continued operation could cause rapid air loss and vehicle crash." The second states: "Belt edge separation could develop during normal driving conditions and may be noticed by slight to moderate vehicle vibration or the appearance of a bubble in the upper sidewall near the tread. Continued operation could cause rapid air loss and vehicle crash." This second notice had not even been issued when the Fords purchased their tires, the time at which they claim they should have been given notice of the significance of any such vibration.

UGTC offered to stipulate that belt separation in any tire could cause vehicle vibration, which fact was known to UGTC. This stipulation, which would have obviated the need for the proof of this by the recall letters, was rejected. While we do not mean to imply that a party may preclude its opponent from tendering evidence by a stipulation, any such evidence must first be admissible and relevant before allowed.

In such a situation, as in *Moseley*, supra, the prejudice to the defendants cannot be ignored, particularly when they were precluded from explaining the contexts of the two unrelated notices.

The denial of the motions in limine requires reversal of both judgments.

(b) Also subject to the motion in limine was the "study" conducted by Hudson, a former employee of UGTC. The trial court's order concerning the motion in limine stated that "Plaintiff may introduce evidence consisting of adjustment data and adjustment claim forms based on claims made for the subject tire and the common green tire for belt edge separation and tread separation condition

codes only, provided such evidence is based on claims asserted prior to the date of NTW's March 1988 sale of the subject tire. All hearsay shall be redacted from any adjustment claim forms."

Hudson stated that, after the corporate merger of Uniroyal and Goodrich in August 1986, he was asked to do a survey of adjustments made by UGTC. The adjustment center was where tires returned by customers for any reason would be returned by the dealers to UGTC. A form for each tire was also sent. This "adjustment form" contained information supplied by the customer as well as the dealer, including a code number for the type of problem. Hudson had the center put aside tires from all of UGTC's plants, including the Tuscaloosa plant where the Ford tire was made. He then went to the center and examined between 2,000 and 3,000 tires. He counted those tires which had belt separations as well as tread separations. The tires examined included all types of tires produced by UGTC. Hudson could not state that any of the examined tires were, in fact, the SP-7000. Although he was unclear about the time span of the study, he stated that he thought it was done in late 1987 and 1988. The tires examined could have been as old as seven years, or produced as early as 1980, and perhaps a few tires produced in 1989 were included.

Based on this examination, Hudson concluded that the "Tuscaloosa plant . . . produced more separations per volume of built tires than the other plants. Even though [another plant] might have produced more tires, had more separation. The percentage per thousand was more. . . ."

Without question, at a minimum, the evidence allowed in through Hudson's testimony was not in compliance with the court's order. There was no showing made that any of the tires inspected from the Tuscaloosa plant were the SP-7000 or the "common green tire" batch involved. Further, no showing of similarity of the tires, defects, or the causes thereof was made.

"[T]he Supreme Court's holding in *Mack Trucks v. Conkle*, supra, makes it clear that before such evidence is admissible for whatever appropriate use, there must be a showing of substantial similarity to the incident at issue. The plaintiff's failure to do so and the repeated breach of the trial court's ruling on the motion in limine . . . constitute reversible error." *General Motors Corp. v. Moseley*, supra at 878 (1). *Engram v. Sonny Campbell's Gulf*, 200 Ga. App. 40, 42 (3) (406 SE2d 551) (1991) (Improperly filling a gas tank half-full with gasoline fuel instead of diesel held not similar to completely filling a tank with improper fuel).

This error mandates reversal of both judgments.

6. Because the error addressed in enumeration 16 is an evidentiary matter likely to recur on retrial, it is addressed.

UGTC contends that the trial court erred in allowing the Fords

to argue that UGTC had resisted discovery and hidden evidence of prior deaths and injuries. UGTC cites *Prevost v. Taylor*, 196 Ga. App. 368 (396 SE2d 17) (1990), for the proposition that pretrial discovery disputes are irrelevant and inadmissible. UGTC further cites OCGA § 9-11-26 et seq. for the proposition that the court, not the jury, decides whether a party has complied with discovery and whether to impose sanctions. UGTC claims that the Fords' charges that UGTC hid evidence of prior injuries was prejudicial and inflammatory and thus a new trial is required.

The Fords contend that evidence that they were forced to subpoena documents which UGTC should have relinquished under the notice to produce, but initially claimed were lost or destroyed, was properly admitted because the jury was authorized to take an adverse inference from UGTC's actions. The Fords contend that this evidence was not accompanied by any argument regarding UGTC's resistance to discovery.

OCGA § 24-4-22 states that when a party fails to produce evidence, a rebuttable presumption arises that the charge against the party is well founded. Because UGTC failed to produce evidence as required under the notice to produce, it was not improper to allow the jury to make an adverse inference from UGTC's apparent initial attempt to hide evidence or avoid discovery. Therefore, this enumeration is without merit.

7. Similarly, the charge not given and addressed in the twenty-first enumeration is addressed.

UGTC contends that the trial court erred in failing to charge on the defense of third-party intervening cause because a defendant who creates a traffic hazard is not the proximate cause of injuries resulting from a third party's negligent failure to avoid the hazard. UGTC contends that Rebecca Parsons, the driver of the station wagon that collided with the Fords' van, qualified as a potential intervening and superseding cause of the injuries suffered by the Fords. Therefore, UGTC concludes that the court erred by not charging the jury on third-party intervening causation and a new trial is required.

The Fords contend that the principle of intervening superseding causation probably does not apply to strict liability cases where liability is not based on negligence, *Firestone Tire & Rubber Co. v. Pinyan*, 155 Ga. App. 343 (270 SE2d 883) (1980), and therefore the court was not required to charge on this principle. However, the Fords contend that even if it does apply, the trial court gave a standard, complete, and accurate charge on causation.

An intervening cause is not treated as the proximate cause if the defendant had reasonable grounds for apprehending that "(such wrongful act) would be committed." *Pinyan*, supra at 348. "Vehicular collision is an event which is foreseeable by the manufacturer." *Ford*

*Motor Co. v. Stubblefield*, 171 Ga. App. 331, 339 (319 SE2d 470) (1984). Because UGTC could have foreseen that a defective tire could leave a vehicle stranded in the highway where an oncoming car might collide with it, the doctrine of intervening cause does not apply and this enumeration has no merit.

8. UGTC's enumerations 12, 14, 15, 17, 18, 19, 23, 24, 25, and 26 were either not the subject of objection below, are moot because of the decisions rendered herein, without merit, or unlikely to occur at any retrial.

9. The Fords have filed cross-appeals in Case Nos. A95A0467 and A95A0470. The sole basis for these appeals is the contention that the trial court erred in failing to issue a proper rule nisi concerning the motions for new trial filed in each case by UGTC. These motions were denied by the trial court.

Since our decisions in the main appeals require retrial, any such issue is moot and these cross-appeals shall be dismissed. *Lynas v. Williams*, 216 Ga. App. 434, 436 (454 SE2d 570) (1995); *General Motors Corp. v. Moseley*, supra at 888 (10).

*Judgment reversed in Case Nos. A95A0465 and A95A0466. Birdsong, P. J., concurs. Beasley, C. J., Johnson, Smith and Ruffin, JJ., concur specially. McMurray, P. J., and Pope, P. J., dissent. Blackburn, J., not participating.*

*Judgment reversed in Case Nos. A95A0468 and A95A0469. Birdsong, P. J., concurs. Beasley, C. J., Johnson, Smith and Ruffin, JJ., concur specially. McMurray, P. J., and Pope, P. J., dissent. Blackburn, J., not participating.*

*Appeals dismissed in Case Nos. A95A0467 and A95A0470. Beasley, C. J., Birdsong, P. J., Pope, P. J., Johnson, Smith and Ruffin, JJ., concur. McMurray, P. J., concurs in judgment only. Blackburn, J., not participating.*

SMITH, Judge, concurring specially.

I join in all but Division 2 of Judge Ruffin's opinion. I agree with Division 2 of the majority opinion that the trial court erred in ordering the addition of new party defendants three days prior to trial without service of process and over the objections of the added defendants.

RUFFIN, Judge, concurring specially.

1. Unlike the majority, I believe that it was reversible error for the trial court to consolidate the two actions for trial over the objection of UGTC. OCGA § 9-11-42 (a) provides in pertinent part: "When actions involving a common question of law or fact are pending before the court, if the parties consent, the court may order a joint hearing or trial of any or all the matters in issue in the actions. . . ." I disa-

gree with the plaintiffs' contention that a "simultaneous" trial is not a "joint" trial within the meaning of OCGA § 9-11-42 (a). I also disagree with the plaintiffs' contention that this error was not harmful because the defendants were not prejudiced by the joint proceeding which also served the purpose of judicial economy mandated by OCGA § 9-11-1. Pretermitting the issue of whether defendants were prejudiced by the joint proceeding, the trial court's action cannot be condoned. "[I]t is not essential for defendants to prove prejudice for if joinder is not authorized by the plain language of the statute, no amount of judicial economy can justify it." *Howard Motor Co. v. Swint*, 214 Ga. App. 682, 683 (448 SE2d 713) (1994) (interpreting OCGA § 9-11-20 (a)). As made clear in *Swint*, statutory provisions concerning joinder are substantive laws that govern the rights of the parties. To permit their violation renders the statute nothing more than a guideline. Consequently, I would reverse.

2. I respectfully disagree with Division 2 of the majority opinion. Based upon the facts of this case, particularly UGTC's failure to distinguish between the corporation and the partnership throughout the long course of the litigation up until the very eve of trial, the trial court did not err in adding the corporation and partnership as parties in each other's case three days prior to trial without service of process.

3. I concur with the majority's conclusions with respect to Division 3 (a) and respectfully dissent with respect to Division 3 (b) regarding punitive damages. While I agree the award of punitive damages should be reversed in light of the improper charge as outlined in the majority's opinion, I feel it necessary to address the defendants' argument that the evidence in this matter did not justify the imposition of punitive damages. While I agree with the defendants that much of the evidence supporting the punitive damage award was inadmissible and may have tainted the jury's verdict, I am not able to hold that the issue of punitive damages is altogether precluded. Upon retrial, should the plaintiffs provide clear, convincing, and admissible evidence that defendants, motivated by profit, knowingly endangered those who used or came into contact with their tires, then the issue of punitive damages may be presented to the jury. *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 885 (447 SE2d 302) (1994).

4. I agree with the majority's opinion with respect to enumerations 9 through 11. In addition to the reasons set forth by the majority, I believe such evidence should not have been admitted absent a showing of substantial similarity between the defects involved and the process used to make each of the recalled tires and the Fords' tire. There was otherwise no basis for the admission of this highly prejudicial evidence.

5. I concur with the majority in all other respects.

I am authorized to state that Judge Johnson joins in this opinion.

BEASLEY, Chief Judge, concurring in part and dissenting in part.

1. I do not entirely agree with Division 1 of the majority. OCGA § 9-11-42, as part of the Civil Practice Act, governs the combining of separate cases for the court proceedings. It does not allow the procedure utilized in the court below because all parties did not consent. There is no other authority for the court to take the action it did, because the Georgia statute, unlike its federal counterpart, severely limits the trial court's authority to control the conduct of hearings and trials. It would make good sense as a matter of economics and efficiency, and it would achieve the end which the Georgia Constitution mandates as the guiding principle of court rules. Art. VI, Sec. IX, Par. I of the Ga. Const. of 1983. The values to be served by permitting a greater amount of latitude to the trial court are articulated in Wright & Miller, Federal Practice & Procedure, Vol. 9, Ch. 7, §§ 2381, 2382 (1995), and Wright, Law of Federal Courts, § 97 (5th ed. 1994). Since the legislature has set the policy for this case management technique, however, trial courts are bound to observe it. See *Douglas County v. Abercrombie*, 226 Ga. 39 (172 SE2d 419) (1970); *Banks v. State*, 124 Ga. 15, 17 (5) (52 SE 74) (1905). By adding unanimous consent as a caveat to the implementation of innovative mechanics for trying cases conjoined in significant ways, the legislature has deposited the power in the parties and not in the trial judge.

I do not agree that the harmless error rule applies. It is not incumbent on the litigant, whose statutory right to withhold consent was violated by conducting a joint proceeding anyway, to prove that it prejudiced his presentation of his case or the jury's consideration of it.

2. I concur in Divisions 2, 4 (a), 4 (b), 5 (a), 5 (b), 6, 7, 8, and 9.

3. With respect to Division 3 (a), the jury charge, the jury should instead simply be instructed that it is not to be concerned about the disposition of punitive damages, if awarded, and that the question of who ultimately is to receive any punitive damages awarded should not influence its consideration of this issue.

4. With respect to Division 3 (b), I agree with Judge Ruffin that the evidence was sufficient to support the jury's award of punitive damages and that the issue of punitive damages may be presented to the jury upon retrial.

McMURRAY, Presiding Judge, dissenting.

I respectfully dissent from the judgments of reversal, as it is my view that no reversible error was committed by the trial court in its procedural or evidentiary rulings. As it is further my view that the trial court correctly charged to the jury on the substance of OCGA

§ 51-12-5.1 (e) (2) and correctly denied the post-trial motions for new trial, for judgment notwithstanding the verdict, and for reduction in damages, I would affirm this product liability judgment in its entirety, large though it may be. Before addressing the evidence, properly viewed in the light most favorable to the party who secured the verdict, I pause only to register my disagreement with the majority that the trial court in the cases sub judice has misapplied *Carney v. JDN Constr. Co.*, 206 Ga. App. 785, 790 (5) (426 SE2d 611), authored by then-Presiding Judge Carley, to retain venue in Fulton County and my further disagreement that the trial court misapplied *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 880 (4), 882 (447 SE2d 302), authored by Judge Blackburn, regarding the admissibility of evidence of similar or subsequent acts which tend to show contemporary knowledge of a defect, causation, or to rebut a defense claim of physical impossibility. Such errors of application are made only in this Court.

"If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." OCGA § 9-11-50 (a). A judgment n.o.v. "is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion." (Citations and punctuation omitted.) *First Union Nat. Bank of Ga. v. Davies-Elliott, Inc.*, 215 Ga. App. 498, 501 (1a), 502 (452 SE2d 132). With this standard in mind, my review of this enormous record reveals the following.

Plaintiffs Franklin E. Ford, Jr. ("Mr. Ford") and his wife, Claudia Ford ("Mrs. Ford"), brought this product liability action against defendants The Uniroyal Goodrich Tire Company, a Delaware corporation, Uniroyal Goodrich Tire Company, a New York partnership (collectively "Uniroyal Goodrich"), and Automotive Corporation d/b/a NTW, alleging defective tire design, defective tire manufacture, and failure to warn. According to the complaint, the Fords' van became stranded on an interstate highway when a 15-inch radial passenger tire designed and manufactured by Uniroyal Goodrich "exploded, separating between its steel belts[.]" One of the steel belts wrapped around the van's axle and emergency brake cable, immobilizing the van in the second left-hand lane. The van was then struck with great force from the rear by an approaching station wagon, driven by Rebecca Parsons. The impact killed Mrs. Parsons and injured Mrs. Ford and her 22-year-old son, Franklin E. Ford III ("Franklin Ford"). Franklin Ford brought a separate but identical complaint, seeking to recover for permanent brain injuries sustained in this collision. By

consent order in the Franklin Ford case, "The Uniroyal Goodrich Tire Company, a partnership, [was] substituted as the party defendant[, in lieu of the former entity known as The B. F. Goodrich Company, without need of] further service of the Complaint or Answer. . . ." Uniroyal Goodrich admitted that it manufactured the "technical excellence SP7000 S tire, size P-235/70 SR15 model steel belted radial tire . . ." on the Fords' van at the time of the collision but denied the tire was defective in any way. Before extensive discovery, Uniroyal Goodrich moved "to consolidate or, in the alternative, assign these companion cases to the same judge, pursuant to OCGA § 9-11-42 (a)," and the cases were assigned to a single judge. Plaintiffs settled with NTW before trial. Over objection by Uniroyal Goodrich, the cases were tried before two separate juries, simultaneously. One jury decided Mrs. Ford's case (with Mr. Ford's consortium claim) as against both the New York Uniroyal Goodrich partnership and the Delaware Uniroyal Goodrich corporation. The other jury decided Franklin Ford's case against the same defendants.

The parties stipulated that "the subject tire . . . was manufactured by defendant [Uniroyal Goodrich], a New York partnership, at the Tuscaloosa plant in Tuscaloosa, Alabama, in the thirty-fifth week of 1987." The following circumstances and chronology are undisputed: Mr. Ford purchased two new tires from NTW on February 18, 1988. He noticed that the van vibrated after these tires were mounted. When Mrs. Ford returned the van to NTW, she was informed that one "tire was out of round" and received a substitute. At the time of the blowout on Saturday, August 26, 1989, the tire at issue had been driven 13,000 miles. That day, the Fords and their two sons were driving north on I-85, returning to Norcross, Georgia, from a vacation in Florida. South of Hartsfield International Airport, Mr. Ford drew Mrs. Ford's attention to a slight vibration, similar to those vibrations of the van observed while driving on the tire they had replaced. She "could feel it going uphill and . . . could not feel it at other times." Although they discussed the possible source of the intermittent vibrations, the Fords never discussed "getting off the road and terminating the trip[.]" Between 5:00 and 5:30 p.m., as they approached the Clairmont Road exit, Mrs. Ford heard "a thump in the van[ . . . and saw that her husband] was just struggling with the [steering] wheel. . . ." Within seconds, she heard "another thump and [Mr. Ford] said, that was the tire." The van "skittered a while and came to a stop. And cars were just coming all around us." In vain, Mr. Ford tried to move the van from the lane of traffic into the emergency lane. Mrs. Ford "could hear him pressing the accelerator and the van would not move." Other cars were "squealing around [them]. They would come up on [the Fords] quickly and have to swerve . . . to get around. . . ." Some vehicles, including a tractor-trailer, had merged

left and passed the stalled van by "going into the emergency lane." The Fords "all agreed that we just did not dare try to get out." They remained trapped in the van for "five or six minutes," strapped into their seats with seatbelts, facing ahead. Franklin Ford turned on the four-way hazard lights while Mr. Ford tried to summon help on the C. B. radio. With the rearview mirror, Mr. Ford observed as Rebecca Parson's station wagon speedily approached from the south, and he exclaimed, "this one's not going to stop." The impact of the ensuing crash pushed the van 200 feet. "It was just like we . . . got hit by a freight train." When the van finally came to rest, Franklin Ford's "seat had twisted and come back so that he was . . . on his back. . . ." He was "trembling and convulsing[, while Mrs. Ford's right] leg was broken."

It is uncontradicted that neither Uniroyal Goodrich nor NTW ever gave the Fords any consumer warning not to drive the vehicle if vibrations were observed because such vibrations could be a symptom of imminent belt separation leading to loss of air and possible vehicle crash. The existence of a manufacturing defect, of the need to warn, and of the foreseeability of the type of catastrophic harm actually sustained were very much in dispute. The following evidence was adduced in support of the contentions that the tire at issue was defectively manufactured and Uniroyal Goodrich failed to warn the Fords of a foreseeable danger: Officer Steve Merrifield, a traffic specialist and accident reconstructionist with the DeKalb County Police, was called to the scene. From his analysis of the physical evidence, the jury was authorized to conclude the "tread had come loose [from the carcass of the tire] and had wrapped around the axle of the vehicle, while the vehicle was moving. The leading edge of the tread had wrapped around the axle; had wedged itself; . . . had locked the left-rear wheel. . . . The tire, with no tread left on the pavement, the cord wore through quickly; blew the tire out. It aired out. The wheel was locked up and . . . the vehicle, basically, became immobilized." Photographs showing where the "rim was grinding on the pavement [indicated that] one of the wheels on the vehicle was . . . locked." This grinding of the pavement started "probably [one] hundred feet . . ." from where the Fords' van came to a halt. Three hundred feet back from that place, Officer Merrifield found "an offset mark that indicated that . . . [the belt] was flapping." So tightly was the belt wrapped around the axle, it took the police "an hour and a half . . ." to remove the wheel without cutting the belt. Stephen P. Disch, M. D., the treating neurologist, thought that Franklin Ford's brain injuries occurred when he "had a side-to-side action and that his head on the right side probably hit something on the right side[, . . . ] then went side-to-side[; . . .] sheared the blood vessels and caused the blood clot." Dr. Disch affirmed that these injuries were compatible

with the Fords' van being propelled first to the right by the blow of the collision "and then, because of the locked wheel on the left, chang[ing] direction to the left." Franklin Ford's permanent brain injuries are "the equivalent of having a stroke." He is "hemiparetic on the left side of his body."

William J. Campbell worked at the B. F. Goodrich plant in Tuscaloosa, Alabama, for over 27 years. Since 1981, he had been in the Quality Assurance Department. In that position he had so-called shut-down authority "in cases of either machine alignment or components or tolerances[.]" However, after the 1986 merger of B. F. Goodrich and Uniroyal Tire Company, he noticed a very definite change in his authority. "Oftentimes, [a machine he ordered shut down] wouldn't stay down. The decision would be made to go ahead and run the machine. There was more of an emphasis put on keeping production going." The post-merger company "relaxed [former] tolerances on components [and . . .] relaxed tolerances on machine alignment."

During the summer of 1987, when this tire was manufactured, Mr. Campbell noticed a continuous emphasis on production, with each of the four plants in the Uniroyal Goodrich system being assigned daily, weekly, and monthly quota productions. While production was increasing, the size of the post-merger Quality Assurance Department was permitted to diminish through retirement and attrition. Mr. Campbell observed green (uncured) tires hanging from racks, where they would "sit there for a number of days before they were cured." Such a delay can cause distortion in uniformity and even lead to "some separations." If a "tread edge lifts and paint gets in there, . . . it could cause a crack or a separation [of the steel belts] when it cured." Because the Tuscaloosa plant had no air conditioning, during the hot and humid summer months, Mr. Campbell "would notice the tack[, i.e., stickiness of uncured tires,] in the different stock would change. [As a result, the manufacturer would] have to change the compounds to increase tack. That was an ongoing process. . . ." In the absence of "a proper amount of tack [the pressure of the stitching cycle] could cause the different components, whether it be belts or cone strip or whatever, it could cause them to shift around, move, literally move." It was not uncommon in the tire room for the indoor temperature to reach 105 to 110 degrees Fahrenheit. When moisture or perspiration got "on the tire itself, especially if it got trapped between plys or between belts or under the tread, that would cause contamination and it probably wouldn't cure out." Workers were offered sweatbands, but some "refused to wear them." John M. Swarts, a retired Manager of General Tire Compounding for Uniroyal Goodrich, confirmed that high temperatures and humidity affect the compounds used in tire building in that "it tends to degrade the tack." Consequently, "it doesn't have as much strength. It won't stick to other

things as good as it used to." Mr. Campbell's diminished Quality Assurance staff no longer could physically inspect the same number of finished tires. They "went from [physically] inspecting [one entire stack] of one group of tires [. . . down to just visually] inspecting the top three tires on the pallet." Mr. Campbell related incidents where production employees would tinker with the preset speed at which the tire is rotated while steel belts were joined to the rubber. This applied the belt faster than it was being fed to the worker and "can stretch and distort the belt by doing that." On one occasion, loose tires from the scrap heap were added to round out a load, and that load was then sent to the warehouse.

In late 1987 and early 1988, William H. Hudson, the Supervisor of Failed Tire Analysis for Uniroyal Goodrich, conducted an investigation of reported tire failures involving "belt separations or separations in the tread areas" for Uniroyal Goodrich management. He determined "that the B. F. G[oodrich] side of the family had more separations returning to the adjustment centers than the Uniroyal tires. . . . And the . . . Tuscaloosa plant . . . produced more separations per volume of built tires than the other plants." He examined "every conceivable tire that was sent back to the adjustment centers[,] of all sizes and all brands[, . . . numbering] close to two to three thousand tires[,]" built between 1984 and 1988. These were tires that customers returned and the manufacturer agreed to take back. If there were no problem with excessive incidents of belt separation, Mr. Hudson expected to see that condition in "less than one percent . . ." of the tires returned for adjustment. When compared to the industry average as the normal rate of return for *all* defects, the percentage of total production returned for belt separations *alone* was eight times greater than that industry average. He further found that, of all the tires returned under warranty for belt separations, "more than ten percent . . ." were manufactured at Tuscaloosa. Based on Uniroyal Goodrich criteria, this was "high enough that you would want to address the situation and to get it back to a normal area." He affirmed that his report was "given to . . . management at Uniroyal Goodrich," sometime in early 1988, i.e., near the time Mr. Ford purchased his tires and 18 months before this tragic collision.

Mr. Hudson also examined the Fords' tire and concluded that "the tire separated because of lack of adhesion between the belt surfaces that are present in this tire." This is evidenced by the "smooth appearance" of the separated belts. Ordinarily, wavy stock lines, called knotty tear lines or serrations, indicate resistance to separation. On the Fords' tire, the "absence of these types of serrations lines indicate that is less adhesion." He observed no "abrasion in the shoulder area to show that this tire was actually running underinflated or overloaded." Rather, he affirmed that the lack of adhesion as the cause of

this tire's failure was a "manufacturing defect[.]"

Richard James Grogan, a pneumatic tire consultant, examined the Fords' tire and found "chafing, that is movement, very small movements, but many, many hundreds of times over inside the tire." Mr. Grogan's X-rays of the Fords' tire show that the stacked steel "belts have been sliding about or snaking as it's known in the business." He also found "shiny bits of brass in the failed tire, that tells us of incomplete adhesion, incomplete bonding," because the brass plating should have been converted to black brass sulfide during the vulcanization process. He found "some bonding, but not enough, not enough to combine all that brass and fuse it to the rubber." Further, Mr. Grogan discounted the likelihood that the Fords abused the tire because, in his opinion, "damage that arises from underinflating . . . , [and] to a certain extent overloading as well, will affect the tire uniformly around." On the Fords' tire, Mr. Grogan found "bits of the tire which are reasonably intact and bits which have come apart. So it can't be underinflation, it can't be overloading. It's wrong in appearance and it's wrong in position." Mr. Grogan also explained that "rubber components have to be fresh and tacky to stay in place where the tire maker puts them. And if the factory is not air-conditioned, then the shelf life, the useful life of those components is very much reduced, and there's a tendency for those sticky components to dry out quite rapidly and air conditioning helps this process enormously."

Steven R. Syson, an accident reconstructionist and former engineer with the "Safety, Research and Development Laboratories at the General Motors Proving Grounds," affirmed that, in his experience, "manufacturers of components [including tires] are [subject to] federal regulations that are . . . the same as . . . for auto makers[.]" The tire manufacturer must comply with "uniform tire quality grading requirements and then tires are also subject to the notification and recall procedures of the National Highway Traffic Safety Administration." Mr. Syson explained that the notification and record-keeping procedures of the U. S. Department of Transportation include the "requirement that all defective products be reported to the National Highway Traffic Safety Administration." In Mr. Syson's opinion, the tire manufacturer had a duty to inspect the "out-of-round" tire that the Fords had returned under warranty. "[A]s a result, if they had inspected that tire, they would have found that that particular tire had a problem with tread separation. And I think, under those circumstances, they had a duty, at least, to notify the National Highway Traffic Safety Administration that they were having a problem with this particular size and date of manufacture of the tire and, then, . . . at that point, [had a further duty to] investigate how many other failures they were having and make a determin[ation] as to whether or not they needed to do a recall." Mr. Syson also affirmed that, "in the

automotive industry, including . . . tires, if a manufacturer knows or has reason to believe that there is a defect, they have a duty to warn the public[.]" Specifically, if the manufacturer knows that a "certain defect presents itself in a certain way, [it has] a duty to warn the public about what to anticipate when that defect shows up[.]" Mr. Syson recalled that General Motors maintained a policy manual for defect and recall procedures that "tells you what to do and how to deal with situations like that and, . . . if you have a problem, then you have a duty to inform the consumer of it[.]"

Plaintiffs' exhibit 93 is a September 2, 1987, document authorizing changes in the manufacturing specifications and indicates that Uniroyal Goodrich was operating under the assumption that certain radial passenger tires produced at Tuscaloosa could be "defective at plant[,]" due to inadequate tack. According to this technical authorization, the modification "will result in a dramatic increase in tack retention (aged up to 4 days). This is very critical during hot summer weather. . . ." However, two months later, on November 2, 1987, Uniroyal Goodrich approved another technical authorization. This technical change abandoned the recent modification, which had been projected to save more than $400,000 per year, and reverted to previous compound and bonding formulae. Although the defense offered alternative explanations for the Fords' tire failure, even the expert tire engineer called by Uniroyal Goodrich conceded that underinflation alone "didn't cause this tire to fail." Redacted copies of service bulletins giving notice and instructions to dealers of the voluntary recall of other Uniroyal Goodrich tires were admitted for the limited purpose of showing the manufacturer's knowledge that "[b]elt separation may also cause moderate to severe vehicle vibration. Continued operation could cause rapid air loss and vehicle crash."

One jury found for Mrs. Ford but against Mr. Ford in his claim for loss of consortium. This jury further determined that Uniroyal Goodrich should not be liable to Mrs. Ford for punitive damages. The other jury found for Franklin Ford and further determined that Uniroyal Goodrich should be liable for punitive damages. After subsequent deliberations, Mrs. Ford was awarded $150,000 for her actual medical expenses and for her pain and suffering. The other jury awarded Franklin Ford more than $465,000 for past medical expenses; $3,022,000 for future medical expenses; $1,561,000 for reduced earning capacity; and $12 million for his pain and suffering. This jury also imposed punitive damages in the amount of $25 million. The four appeals in Case Nos. A95A0465, A95A0466, A95A0468, and A95A0469 follow the denial of post-trial motions by Uniroyal Goodrich for new trial, for judgment n.o.v., and for reduction in damages. The 26 enumerations of error urged are broadly classified as procedural objections, evidentiary objections, and exceptions to jury instructions. In

Case Nos. A95A0467 and A95A0470, Franklin Ford and Mrs. Ford cross-appeal from the order of the trial court denying their motions to dismiss the post-trial motions of Uniroyal Goodrich.

*Case Nos. A95A0465, A95A0466, A95A0468, and A95A0469*

1. In the first enumeration, Uniroyal Goodrich contends the trial court committed procedural error by "conducting simultaneous trials of unconsolidated cases without the consent of the parties. . . ."

OCGA § 9-11-42 (a) provides: "When actions involving a common question of law or fact are pending before the court, if the parties consent, the court may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs and delay." In the cases sub judice, there was no consent by Uniroyal Goodrich to a joint trial before separate juries. Accordingly, the trial court did err in ordering the joint trials of unconsolidated actions without the consent of the parties. However, the State Court of Fulton County had jurisdiction over each Uniroyal Goodrich defendant separately by reason of their being properly named and served in the substantively identical suits as filed by Mr. and Mrs. Ford against the Delaware corporation and by Franklin Ford against the New York partnership, respectively. Furthermore, venue remained proper in Fulton County despite the plaintiffs' settlement with NTW, the sole resident defendant. *Carney v. JDN Constr. Co.*, 206 Ga. App. 785, 790 (5), supra. Consequently, the error in trying the separate cases jointly without the consent of the parties "does not require a reversal of the judgment[.]" *Herring v. McLemore*, 248 Ga. 808, 809 (4) (286 SE2d 425).

2. Three days before trial, in response to plaintiffs' motions to add a party, the trial court amended the pretrial order to add the New York partnership Uniroyal Goodrich as a defendant in Mrs. Ford's case and to add the Delaware corporation Uniroyal Goodrich as a defendant in the "Franklin Ford, III case[.]" Although the trial court considered that it was merely correcting the style of the case, defendants objected, arguing that "new parties have an absolute right to be served, answer the complaint, and opportunity to raise any personal defenses or other defenses they may have to any claims." In the fourth enumeration, Uniroyal Goodrich complains of this procedure.

Appellate courts are reluctant to control an exercise of the discretion reposed in the trial court by OCGA § 9-11-16 in formulating and amending the pretrial order. *Ambler v. Archer*, 230 Ga. 281, 285 (1), 287 (196 SE2d 858). Assuming without deciding that in the cases sub judice Uniroyal Goodrich did not invite this procedure by its previous motion for consolidation of the cases under OCGA § 9-11-42, and

pretermitting whether each Uniroyal Goodrich defendant waived service of process in the opposite suit by making a general appearance, I note that substance and function prevail over nomenclature. *Chan v. W-East Trading Corp.*, 199 Ga. App. 76, 77 (4) (403 SE2d 840). Strictly speaking, neither Uniroyal Goodrich defendant is a stranger or a "new" party to the substance of these product liability actions, since each had been properly served in one action or the other, and each filed responsive pleadings and engaged in extensive discovery over a period of many months. Compare *Stone Mountain Aviation v. Rollins Leasing Corp.*, 174 Ga. App. 35, 36 (2) (329 SE2d 247). In the cases sub judice, the substance of the trial court's action in amending the pretrial order was to make all allegations uniform against each *existing* defendant, rather than to make a complete stranger to the action a new defendant. See OCGA § 9-11-16 (a) (2). Here, neither the Delaware corporation nor the New York partnership has shown that it was unfairly surprised, that a valid defense was surrendered, that a valuable cross-claim was lost, or that the amendment created rather than prevented a "manifest injustice" under OCGA § 9-11-16 (b). Moreover, it appears that any risk of harm from additional exposure to liability may be addressed in a separate action for contribution or indemnification. It follows that any error in not requiring service of an amended complaint after the amendment of the pretrial order is not fatal to the judgment in this instance. This enumeration is without merit, and so I respectfully dissent from the majority's holding to the contrary.

3. Uniroyal Goodrich enumerates the denial of its motion for judgment n.o.v. as to the punitive damages awarded for Franklin Ford's permanent partial paralysis and loss of mental capacity, arguing that a "mere 'battle of the experts' is not clear and convincing evidence of malice or wantonness." I do not agree.

The evidence that Uniroyal Goodrich management knew, from its own internal investigation conducted by Mr. Hudson, that belt separation due to inadequate tack occurred with a markedly greater frequency among tires manufactured at Tuscaloosa during the hot and humid summer months was, in the opinion of Mr. Syson and others familiar with the applicable regulations, sufficient to trigger defect-reporting requirements imposed on the industry by federal law. Although Uniroyal Goodrich vigorously contested the applicability of the reporting requirements, the evidence on that issue was in conflict. See *Windermere v. Bettes*, 211 Ga. App. 177 (1), 178 (438 SE2d 406).

" 'A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling . . . the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use . . . he may be required to give adequate warning of the danger . . . and a

product sold without such warning is in a defective condition.' Restatement of the Law, Torts 2d, p. 351, § 402 A, comment h." *Center Chem. Co. v. Parzini*, 234 Ga. 868, 869 (3) (218 SE2d 580). "In failure to warn cases, the duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of the product. [Cits.] An actual or constructive knowledge is consonant with Georgia tort law in general, [cits.]; . . . see also Restatement (2d) of Torts, § 402A, Comment j (seller is required to give warning 'if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge' of the danger [cit.]; [cit.]." *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1) (450 SE2d 208). In the cases sub judice, the Franklin Ford jury was authorized to find that the frequency of belt separations occurring in tires made during the summer at the Tuscaloosa plant, by the application of reasonable, developed human skill and foresight, put Uniroyal Goodrich on notice of its duty to warn consumers not to continue driving on a vibrating tire. "However, negligence, even gross negligence, is inadequate to support a punitive damage award. Under OCGA § 51-12-5.1 (b), which is applicable in the instant case, it remains the rule that something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage. There is general agreement that, because it lacks this element, mere negligence is not enough." (Citations and punctuation omitted.) *Ivey v. Golden Key Realty*, 200 Ga. App. 545 (1) (408 SE2d 811).

In my view of the cases sub judice, once the manufacturer was apprised of the results of Mr. Hudson's internal investigation, it had a duty to act. The subsequent failure of Uniroyal Goodrich to warn of or otherwise remediate a latent hazard which was nevertheless obvious to the manufacturer is some evidence of scienter, i.e., reckless disregard of the known facts. This circumstance provides a clear and convincing evidentiary basis for the award of punitive damages in some amount against the manufacturer of the defective product under the standards established by OCGA § 51-12-5.1 (b) and (e) (1). In Georgia, the "purpose of punitive damages [generally] is to deter the repetition of reprehensible conduct." *Hosp. Auth. of Gwinnett County v. Jones*, 261 Ga. 613, 614 (1) (409 SE2d 501). The purpose of subsection (e) (1) of OCGA § 51-12-5.1 specifically "is to authorize punishment of a defendant who has the potential to greatly damage society at large." *Mack Trucks v. Conkle*, 263 Ga. 539, 541 (2a), 542 (436 SE2d 635). Compare *Stone Man, Inc. v. Green*, 263 Ga. 470, 471 (1) (435 SE2d 205) (Compliance with legal standards established by operating permits tends "to show there is no clear and convincing evidence of 'willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a con-

scious indifference to the consequences.' [Cit.]"). In the cases sub judice, an award of punitive damages was authorized to deter in the future a dilatory response to a manufacturer's own evidence reliably indicating a safety threat to the motoring public. *Mack Trucks v. Conkle*, 263 Ga. 539, 544 (4), supra. See also *Windermere v. Bettes*, 211 Ga. App. 177 (1), 178, supra, applying the whole court decision in *J. B. Hunt Transport v. Bentley*, 207 Ga. App. 250, 256 (3) (427 SE2d 499). As it is my view that the trial court did not err in denying the motion for directed verdict as to punitive damages, I respectfully dissent from the majority's holding to the contrary.

4. Uniroyal Goodrich also contends the trial court erred charging the jury on the substance of OCGA § 51-12-5.1 (e) (2). This Code subsection provides that 75 percent of the punitive damages awarded in a product liability action, less a proportionate part of the costs of litigation, will be paid into the treasury of the State of Georgia. While it is argued that informing the jury of this fact will encourage an increase in the amount of the award, I do not agree that any such influence is beyond the scope of the present statutory scheme.

OCGA § 51-12-5.1, as enacted in 1987 and since amended, provides a comprehensive scheme governing the imposition of punitive damages in the courts of this state. In the case of product liability claims, there are two significant changes from previous law. First, repeated awards of punitive damages for the same conduct (no matter how egregious) were eliminated. Now, only one award of punitive damages may be recovered from a product liability defendant for any act or omission regardless of the number of causes of action which may arise from such act or omission. OCGA § 51-12-5.1 (e) (1). The second change is the division of any punitive damages award between the plaintiff and the public treasury as noted in the challenged charge. OCGA § 51-12-5.1 (e) (2). The issue presented is what is the jury's role in this statutory scheme.

Either the jury is informed of the provisions of the statutory scheme and allowed to consider this information in reaching its verdict on punitive damages or charges detailing the statutory scheme are prohibited. The latter approach results in an attempt to reach a punitive damages award on the same theoretical basis as under prior law despite extensive legislative reform of OCGA § 51-12-5.1 as amended. However, since the statutory provisions are general law and have been widely publicized, a choice not to charge on this Code subsection must endure the fact that many jurors will have independent knowledge of the statutory scheme.

In *Mack Trucks v. Conkle*, 263 Ga. 539, 541 (2a), 543, supra, the Supreme Court of Georgia rejected an equal protection challenge to OCGA § 51-12-5.1 (e) (2), holding that under the statute similarly situated parties would be treated equally. In order for equal treat-

ment to be a reality, there must be consistency as to whether or not jurors are aware of the statutory provision. Apart from the presumption of knowledge of the law, this is a well-publicized general law. It must be anticipated that some portion of the jurors chosen to serve on product liability cases will be aware of the statute and bring this knowledge into the jury room. Thus, as a practical matter, the option of having product liability cases decided in every instance by a jury ignorant of this law is probably not available. If the parties in all such cases are to be treated equally, the instruction of the jurors as to such applicable statutes is necessary and proper.

There is no denial that the charge in question is a correct statement of the law. The general rule is that a requested charge which is a correct statement of the law and properly adjusted to the evidence may and should be included in the trial court's instructions to the jury. This rule, like many others, is subject to a number of exceptions, and it is argued here that the charge is erroneous because it encourages the jury to increase its punitive damages award. This objection may have intuitive appeal but erroneously presupposes that such an increase of the one-time punitive award is unfair or prejudicial under the Georgia statutory scheme. If jury charges are to be rejected simply because they may influence the verdict, what instruction could possibly be proper for the jury's consideration?

The underlying assumption of this enumeration of error is that an award of punitive damages in a product liability case under the present scheme should be no greater than that which would have been awarded in a similar case under prior law. In my view, this assumption is without support in the record and is contrary to the express provisions of OCGA § 51-12-5.1 (e). The present scheme for punitive damage awards in product liability cases presents a tradeoff in that there now may be only one award of punitive damages in product liability for a given act or omission (no matter how egregious) but that one verdict is "unlimited." See *Mack Trucks v. Conkle*, 263 Ga. 539, 541 (2a), 543, supra. If that one unlimited award of punitive damages is to stand in the place of several awards which might have followed but for this statutory scheme, it seems reasonable to anticipate that this one award could be larger than amounts awarded in similar cases under prior law. The statutory tradeoff is facilitated by the provision diverting 75 percent of the proceeds to the public treasury which reduces any constraint on the jury arising from concern for unduly enriching a plaintiff who has already been awarded compensation for his claim. In order for this tradeoff to be realized, the jury must be instructed as to the statutory scheme. The charge on OCGA § 51-12-5.1 (e) (2) was not error.

5. In the twenty-third and twenty-fourth enumerations, Uniroyal Goodrich nevertheless contends the trial court erred in failing to set

aside the $25 million punitive award as outrageous and excessive.

OCGA § 51-12-5.1 (e) (1) provides: "In a tort case in which the cause of action arises from product liability, there shall be no limitation regarding the amount which may be awarded as punitive damages." In Georgia, the amount of punitive damages to be awarded (if any), like damages for pain and suffering, has long been determined according to the facts of the case as evaluated in the enlightened conscience of a fair and impartial jury. *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 763 (5b), 764 (386 SE2d 120), judgment reinstated on remand, 261 Ga. 613, supra. "There is no other measure of damages for such a case." *Central R. & Banking Co. v. Roberts*, 91 Ga. 513, 519 (6) (18 SE 315). Nevertheless, "each verdict must be scrutinized to see that it meets the parameters of due process." *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 763 (5b), 766, supra. "An inordinately large deterrence award may be set aside as reflecting undue passion and prejudice, rather than an enlightened conscience. *Jones v. Spindel*, [122 Ga. App. 390, 392 (6) (177 SE2d 187)]." *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 762 (2), n. 9, supra. See also OCGA § 51-12-12.

"As [I] understand the law as to excessive verdicts, a verdict will not be set aside as excessive by this court unless it manifestly appears from the record that it was a result of prejudice, bias or gross mistake. [Cit.]" *Colonial Stores v. Coker*, 77 Ga. App. 227, 234 (9) (48 SE2d 150). " 'A verdict in one of that class of cases in which the amount of damages is left to the enlightened conscience of [a fair and impartial] jury is not to be declared by a reviewing court to be excessive, unless it is so large in amount as to justify the court in believing that it could not reasonably have resulted from any other cause than bias or gross mistake on the part of the jury.' [Cit.] . . . '[The existence of such bias or gross mistake is usually] a matter of inference; and in that event the solution falls within the rule as to circumstantial evidence, — there must be no reasonable hypothesis other than that the bias or mistake did exist.' . . . The presumption is that the jurors were impartial and understood their case. It is, therefore, a more 'reasonable hypothesis' that their finding was based on the evidence considered impartially." *Realty Bond & Mtg. Co. v. Harley*, 19 Ga. App. 186, 187 (2), 189 (91 SE2d 254). "An excessive or inadequate verdict constitutes a mistake of fact rather than of law. It addresses itself to the discretion of the trial judge who saw the witnesses and heard the testimony. This court is a court for the correction of errors of law only, and this court's jurisdiction is confined to the question of whether the trial court abused [its] discretion in overruling the motion for new trial [or for reduction of damages] on this ground. [Cits.]" *St. Paul Fire &c. Ins. Co. v. Dillingham*, 112 Ga. App. 422, 425 (145 SE2d 624). In the cases sub judice, the evidence authorized

the conclusion that Uniroyal Goodrich failed to act diligently and warn consumers in the face of the reliable evidence of recurring manufacturing defects in tires manufactured during the summer at the Tuscaloosa plant. Applying the presumption that the jurors were impartial and understood their case, including the fact that OCGA § 51-12-5.1 (e) (1) permits only a single award of punitive damages in a product liability case, the $25 million actually awarded by this jury is reasonably explained as the permissible result of the jury's proper application of the pertinent factors. See *Hosp. Auth. of Gwinnett County v. Jones*, 259 Ga. 759, 763 (5b), 764, fn. 13, supra. In the cases sub judice, the trial court correctly denied Uniroyal Goodrich's motion to set aside the punitive damage award.

As I would affirm the judgments of the trial court in their entirety, I respectfully dissent from the judgments of reversal.

I am authorized to state that Presiding Judge Pope joins in this dissent.

POPE, Presiding Judge, dissenting.

I agree with Presiding Judge McMurray that the judgments should be affirmed, but write separately to make clear my position on several issues.

First, I urge the legislature to amend OCGA § 9-11-42 (a) to give trial courts the discretion to consolidate trials without the parties' consent. We are the *only* jurisdiction in the country to circumscribe the trial court's discretion in this way. Where the facts, issues and parties in two cases are essentially the same, why should we allow an obstinate party to force the court to be inefficient?

Given our current version of OCGA § 9-11-42 (a), I must agree with Judge Andrews' analysis in Division 1 and his conclusion that the trial court's dual jury innovation was unacceptable without the parties' consent. I do not like this result, however. We should be encouraging trial court efforts to be innovative and creative in dealing with complex and unwieldy cases, but instead we must rebuff such efforts based on the wording of OCGA § 9-11-42 (a). I therefore suggest this section be changed.

With respect to Judge Andrews' Division 3 (a), I think the jurors should be instructed on the distribution of the punitive damage award. If they are not, they will assume it is all going to the plaintiff. And their award could be influenced by concerns about giving this plaintiff such a large windfall, even if a large award is necessary to punish and deter defendants.

Whether or not the jurors are informed about the distribution of the award, I believe — as Chief Judge Beasley suggests — that they should be instructed that they are not to be concerned with the disposition of the award. Moreover, the trial court should re-emphasize

that any punitive damages award should be based solely on the amount necessary to punish and deter the defendants.

Lastly, with respect to Division 3 (b) of Judge Andrews' opinion, it is important to note that the "majority" does *not* have a majority of votes for its position that the punitive damages award is unsupported. Accordingly, on retrial the jury can again consider the issue of punitive damages.

DECIDED JULY 14, 1995 —
RECONSIDERATION DENIED JULY 31, 1995 — 

*Love & Willingham, Daryll Love, Allen S. Willingham, Robert P. Monyak, Alston & Bird, G. Conley Ingram, R. Wayne Thorpe, Cynthia Counts*, for Uniroyal Goodrich Tire Company.

*Smolar, Roseman, Brantley & Seifter, Yehuda Smolar, Barry L. Roseman, James I. Seifter, Thomas A. Rice, William B. Herndon*, for Fords.

*Barnes, Browning, Tanksley & Casurella, Roy E. Barnes, Elliott & Blackburn, W. Gus Elliott, Walter G. Elliott II, Neely & Player, Richard B. North, Jr., Lorre J. Gaudiosi, Kaye, Scholer, Fierman, Hayes & Handler, Terrence B. Adamson, Brinson, Askew, Berry, Seigler, Richardson & Davis, Robert M. Brinson*, amici curiae.